Case 18-40295   Doc 56-1   Filed 03/08/18   Entered 03/08/18 16:17:32   Desc Exhibit
Exhibit A   Page 1 of 19

Proper Protection of Patients in Health Care Businesses in..., 44 No. 3 UCC L. J....

44 No. 3 UCC L. J. ART 4

UCC Law Journal
Volume 44, Issue 3
July 2012
Uniform Commercial Code Law Journal

Proper Protection of Patients In Health Care Businesses In Bankruptcy:
Continuing Development And Application of Section 333 of the Bankruptcy Code

U.S. Bankruptcy Judge Jeff Bohm and Jennifer Chang [*]

## I. Introduction

In 2000, five of the 10 largest nursing home chains, comprising of approximately 1,600 of the nation's 17,000 nursing homes, operated under Chapter 11 protection. [1] Due to the recent economic recession, nursing home chains are still facing financial trouble. [2] Iowa's Senator Charles Grassley introduced health care amendments because of an incident at the Reseda Care Center. [3] The Reseda Care Center in California—a nursing home with 63 residents—filed for bankruptcy on September 5, 1997, and the residents' relatives allegedly did not learn of the center's closure until it appeared on the evening news. [4]

One reason that Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") [5] was to protect patients' rights in health care business bankruptcy cases because "patients have no standing to appear before the bankruptcy court." [6] Moreover, the patient care ombudsman ("PCO"), now authorized under BAPCPA, can keep the court and all parties in interest apprised of the quality of patient care, which will ensure that a crisis similar to the one at the Reseda Care Center does not reoccur. [7]

BAPCPA created a PCO, among other provisions, to provide patients with a voice and an advocate in bankruptcy cases. [8] Arguably one of the most important and controversial amendments states:

> If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court **shall** order, not later than 30 days after the commencement of the case, the appointment of any ombudsman to monitor the quality of patient care and to represent the interests of patients of the health care business **unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.**" [9]

Since the enactment of BAPCPA, concerns about patient rights still remain. From 2005 to 2011, business [10] bankruptcy petition filings have increased by 60.9%. [11] Although the number of business bankruptcy petition filings decreased from 2010 to 2011, [12] the number of health care business filings for bankruptcy is still alarming. [13] The recession has affected many industries, including the nursing home industry. [14]

This Comment provides a comprehensive look at Section 333 of the Bankruptcy Code ("the Code") and the issues relating to the appointment of a PCO. First, Part II discusses the duties and role of a PCO in a health care business bankruptcy. Next, in Part III, this Comment examines the two-step inquiry used by courts to determine whether appointment of a PCO is necessary. An overview of the existing case law demonstrates that courts vary widely in their interpretations of the statute, resulting in decisions contrary to Congress' intent when enacting the statute. More specifically, there is

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT
A

controversy surrounding several issues: (i) whether the debtor [15] qualifies as a health care business; (ii) whether Congress intended to include outpatient facilities in the health care business definition; (iii) whether a PCO is necessary under the specific facts of the case; and (iv) whether a PCO is necessary when a Chapter 7 debtor closes its health care business and is no longer treating patients.

In determining whether a PCO is necessary under the specific facts of the case, courts frequently consider the financial burden of appointing a PCO as a factor that weighs against appointment—excluding patients from the Code's protections, even though Congress did not mention the debtor's financial status in the statute. Although the quality of patient care can decline at any point during the pendency of a bankruptcy case, courts accord significant weight to the absence of pre-petition patient care issues. It is unclear what Congress meant when it sought to monitor the "quality of patient care" because Congress did not specifically indicate the level of patient quality that warrants the appointment of a PCO. Congress should amend § 333 to ensure that courts do not forego the appointment of a PCO in cases in which the patients are those whom Congress sought to protect.

In Part IV, this Comment examines how PCOs are compensated and whether PCOs should be allowed to be compensated on an interim basis. Part V discusses how PCOs lack the statutory authority to employ and compensate professionals, such as legal counsel. In some circumstances, it is conceivable that a PCO may need to retain counsel in order to carry out his/her responsibilities. As such, Congress should amend the Code to expressly authorize PCOs to employ and compensate professionals in those situations.

Finally, in Part VI, this Comment proposes an alternative to the appointment of a PCO—voluntary self-reporting by the debtor—which some courts have utilized in lieu of appointment to ensure that the debtor continues to provide quality patient care.

## II. The Role of a Patient Care Ombudsman

Mr. Keith Shapiro (Co-Managing Shareholder at Greenberg Taurig)—who testified on June 1, 1998, before the United States Senate Committee on the Judiciary Subcommittee on Administrative Oversight and the Courts—stated that the PCO provision of S. 1914 [16] was "a natural extension of the concerns which led to the enactment of the Long-Term Care Ombudsman Program," [17] which requires every state to "establish an ombudsman program to, among other things, monitor the quality of care in nursing homes and investigate any complaints." [18] The role of the State Long-Term Care Ombudsman ("SLTCO") program is limited. [19] This program is reflected in § 333(a)(2)(B). [20]

Congress slightly expanded the duties of a PCO appointed in other types of health care businesses [21] under §§ 333(b) and (c)(1). [22] The PCO is "an observer of the debtor's business operations rather than an active participant," [23] but the scope of the PCO's duties remains undefined. PCOs can be very effective in ensuring that patient care concerns are addressed and providing that the quality of patient care does not decline significantly during the pendency of the bankruptcy case. [24]

Many debtors argue that a PCO is unnecessary because many health care businesses are already heavily regulated by public and private agencies, and many health care businesses already have internal quality controls in place to monitor the quality of patient care. [25] Congress anticipated that debtors would make this argument because it included § 333(2) (A) in the PCO provision, which requires the United States Trustee [26] to appoint one *disinterested* person [27] (other than the United States trustee) to serve as the PCO. [28] It is unclear whether the PCO can make recommendations that exceed the practices of state or federal agencies. Congress did not intend for the PCO to displace each state's department of health. [29] Rather, the PCO should work together with the department of health in reporting any issues, providing it with copies of reports concerning patients, and obtaining from the department of health any incident reports. [30]

### III. Appointment of a Patient Care Ombudsman

Courts generally employ a two-step inquiry to determine whether appointment of an ombudsman is necessary. First, the court determines whether the debtor is a health care business; [31] second, the court assesses whether appointment of a PCO is necessary under the facts of the case. [32] However, in some cases, the court did not address the first issue—whether the debtor is a health care business—because it first determined that the appointment of a PCO was unnecessary under the facts of the case. [33]

On its face, the statute appears unambiguous, but the language has caused confusion, resulting in inconsistent decisions. [34]

### A. "Health Care Business" Definition

If the court determines that the debtor is not a health care business under § 101(27A), then it is not required to appoint a PCO. [35] In order to qualify as a "health care business" under § 101(27A)(A), four elements must be present: (i) the debtor can be either a private or public entity; (ii) the debtor must be primarily engaged in offering to the general public facilities and services; (iii) the facilities and services must be for the diagnosis or treatment of injury, deformation, or disease; [36] and (iv) the facilities must be for surgical care, drug treatment, psychiatric care or obstetric care. Satisfying all of these elements has led to litigation due to uncertainty over how to interpret certain language in the statute. [37]

### 1. General Public Defined

Although 11 U.S.C.A. § 101(27A) does not refer to patients, it refers to providing services to the general public. [38] Courts have had difficulty defining the term "general public," [39] resulting in inconsistent determinations of whether the debtor is a health care business. The *Pinellas* court held that the debtor was not "primarily engaged in offering facilities and services to the general public" because it primarily interacted with physicians, and not patients. [40] Although the debtor provided laboratory services to patients referred by other physicians, the court found that these services were ancillary to its primary function—providing administrative support to a group of doctors, including billing, insurance, human resources, related financial services, and laboratory support. [41]

The *7-Hills Radiology* court narrowly construed the term "general public" by excluding patients of health care providers who obtain business through referrals. [42] The court held that the debtor did not offer its services to the general public because it performed radiological tests only for patients who are referred by treating physicians, did not advise the patients of the test results, and did not keep the patients' records. [43] However, one court held that the debtor was a health care business, even though the debtor provided radiological services primarily upon physician referrals, did not provide follow-up care, and merely forwarded the reports to the patient's physician. [44]

In *Alternate Family Care*, the court held that the debtor, a state-licensed child placing and caring agency, was offering services to the general public because its website included a contact number. [45] Although it was rare, it was **possible** for members of the general public to contact the debtor directly for services, even though the majority of the children under the debtor's care were referred from another agency. [46]

The only distinction between *Alternate Family Care* and *7-Hills Radiology*, a website with the business' phone number and the possibility of the general public contacting the debtor directly, [47] should not be a conclusive factor when determining whether the debtor is a health care business because the vast majority of health care providers obtain business through

referrals. [48] Surely, Congress did not intend to eliminate protections for patients of health care providers based on a mere technicality.

In *Pinellas*, physicians were the targets of the debtor's services; but in *7 Hills Radiology*, *Genesis Hospice Care*, and *RADI ONE*, the patients were the targets of the debtor's services. When determining whether a debtor is a health care business, courts should examine who actually receives the services and construe "general public" to include businesses providing direct patient care services.

Although patients are the primary focus of the health care amendments, Congress failed to refer to patients in the "health care business" definition. Congress should reduce the risk of eliminating patients from the protection of the Code by explicitly defining "health care business" to include patients that it sought to protect by enacting the BAPCPA.

### 2. Did Congress Intend to Include Outpatient Facilities in the Health Care Business Definition?

Section 101(27A)(B) provides a non-exhaustive list of the types of entities that qualify as a health care business. [49] Statutes should be interpreted based upon their plain meaning. [50] Thus, courts should interpret § 101(27A) as requiring the debtor to meet both subsections (A) and (B) in order to qualify as a health care business because Congress used the conjunctive "and" to connect the subsections. [51] Despite the plain meaning rule, one court disregards the conjunctive "and" between subsections (A) and (B). [52]

In addition to the misinterpretation of the use of the conjunctive "and" between subsections (A) and (B), some courts rely on additional factors that are completely absent from § 101(27A), resulting in the elimination of patients from the Code's protection. Although Congress utilized "includes" in § 101(27A)(B), which means it is a non-exhaustive list pursuant to § 101(3), [53] some courts have interpreted subsection (B) to be an exhaustive list of entities that meet the definition of a "health care business." [54] As a result, these courts have concluded that the types of businesses listed in § 101(27A)(B) reflect Congress' intent to target businesses that have "some form of direct and ongoing contact with patients to the point of providing them shelter and sustenance in addition to medical treatment." [55] One court broadly interpreted the health care business definition by appointing a PCO, even though the debtor argued that it did not provide its patients with shelter and sustenance, but provided only limited outpatient services. [56]

Based on the plain meaning of the statute, it appears that Congress did not intend to require a health care business to provide patients with: (i) "direct and ongoing contact" or (ii) "shelter and sustenance in addition to medical treatment." [57] First, ancillary ambulatory, emergency, or surgical treatment facilities [58] do not provide patients with "direct and ongoing contact"; instead, services are provided on an outpatient basis. [59] Second, these ambulatory facilities, in addition to home health agencies, [60] do not provide patients with "shelter and sustenance." The National Center for Health Statistics, a division of the Centers for Disease Control and Prevention, defines "home health care" as a "range of medical and therapeutic services as well as other services delivered at a patient's home or in a residential setting." [61] Thus, from the list of types of health care businesses in § 101(27A)(B), it does not appear Congress intended to restrict § 333 to in-patient facilities.

However, one court argued that the sparse legislative history from earlier versions of proposed amendments to the Code indicate that a "health care business" refers to in-patient care facilities, such as hospitals and nursing home, and not most outpatient facilities—such as physician's offices, dental and chiropractic offices, and urgent care centers. [62] Conversely, some courts have found that the debtor was a health care business, even though it provided only outpatient services. [63] The health care business definition should not depend on where the debtor provides its services. [64]

Because the sparse legislative history seems somewhat inconsistent with the health care business definition under § 101(27A)(B), it is unclear whether debtors who provide only outpatient services qualify as a health care business. Although the case law is in conflict, the United States Trustee ("UST") generally favors a broad interpretation of § 101(27A). [65]

Given the UST's position, which seems consistent with the Congressional intent of BAPCPA to strengthen the protection afforded patients at health care facilities, Congress should consider amending § 101(27A) to expand the definition of health care business.

### 3. Why Did Congress Include Chapter 7 Debtors in the PCO Provision?

Pursuant to § 333(a)(1), the court shall appoint a PCO in **any chapter 7, 9, or 11** case filed by a health care business. [66] It is understandable why Congress included Chapter 9 and 11 debtors in the PCO provision because the bankruptcy filing may still impact patients. However, in chapter 7 cases, the health care business generally closes [67] and there is no ongoing patient care. As such, some courts have declined to appoint a PCO because the debtor has no patients. [68] The *Banes* court noted that the debtor's lack of active patients was contrary to the plain language of the present tense statutory definition of "health care business," requiring the debtor to be "primarily engaged in offering" [69] health care services to the general public. [70] It does not appear that Congress intended for the statute to apply to health care businesses that are no longer treating patients during the bankruptcy case because a PCO's primary duties are "to monitor the quality of patient care and to represent the interests of the patients" [71] Congress should eliminate chapter 7 debtors who have ceased operations from the statutory language. [72]

### B. Mandatory Appointment of a Patient Care Ombudsman

If the bankruptcy court determines that the debtor is a health care business, it must appoint a PCO unless it finds that the appointment "is not necessary for the protection of patients under the specific facts of the case." [73] Despite the mandatory language of the statute, bankruptcy courts frequently have exercised their discretion to refuse appointment of a PCO, even if the debtor is a health care business. [74]

### 1. Is a Patient Care Ombudsman Necessary Under the Specific Facts of the Case?

Any party opposing the appointment of a PCO has the burden of showing that "appointment of an ombudsman is not necessary for the protection of patients." [75] If the moving party provides sufficient evidence that a PCO is not necessary for the protection of patients, the UST may decide not to oppose a motion to avoid the appointment. [76]

### a. Factors to Consider When Determining Whether Appointment of a PCO Is Necessary

Since the enactment of the BAPCPA in 2005, courts have examined various factors in determining whether appointment of a PCO was necessary under the specific facts of the case. Some courts have considered the cause of the bankruptcy and found that the appointment of a PCO was unnecessary because the bankruptcy filing arose from issues unrelated to the quality of patient care. [77]

In 2007, the court in *In re Alternate Family Care* used a totality-of-the-circumstances approach and set forth a list of nine, non-exhaustive factors:

(1) the cause of the bankruptcy;

(2) the presence and role of licensing or supervising entities;

(3) debtor's past history of patient care;

(4) the ability of the patients to protect their rights;

(5) the level of dependency of the patients on the facility;

(6) the likelihood of tension between the interests of the patients and the debtor;

(7) the potential injury to the patients if the debtor drastically reduced its level of patient care;

(8) the presence and sufficiency of internal safeguards to ensure appropriate level of care; [and]

(9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization. [78]

Like *Total Woman Healthcare* and *Saber*,[79] the bankruptcy filing in *Alternate Family Care* did not arise from patient care issues.[80] Rather, Alternate Family Care—a state-licensed child placing and caring agency which generated revenues from insurance companies or the government—filed for bankruptcy because there was a fire at its most profitable facility and its insurance did not cover the costs of repair and rebuilding the facility.[81] The *Alternate Family Care* court found that only two of the nine factors favored appointment of a PCO—the level of dependency of the patients on the facility[82] and the potential injury to the patients if the debtor drastically reduced its level of patient care.[83] Despite these circumstances, the court held that the appointment of an ombudsman was unnecessary because: (i) the debtor was supervised by several state and private entities; (ii) the debtor only had three patient care complaints over the course of twenty years; (iii) the children's inability to protect their own interests would not be amplified by the bankruptcy case; (iv) it was unlikely that there would be tension between the patients and the debtor because the debtor had a strong interest in a successful reorganization; (v) there were sufficient internal safeguards to ensure an appropriate level of care; and (vi) the debtor could not afford a PCO.[84]

Courts have broad discretion in the weight given to each of the nine *Alternate Family Care* factors.[85] Several courts have applied the *Alternate Family Care* factors and determined that the appointment of a PCO was unnecessary.[86] In addition to the *Alternate Family Care* factors, courts may consider factors set forth in *Collier on Bankruptcy*, a preeminent bankruptcy treatise:

(1) the high quality of the debtor's existing patient care;

(2) the debtor's financial ability to maintain high quality patient care;

(3) the existence of an internal ombudsman program to protect the rights of patients; and/or

(4) the level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant. [87]

In *Valley Health System*, the court held that the Chapter 9 debtor, a local health care district that operated three hospitals and skilled nursing facility, was a health care business, but appointment of a PCO was not necessary for the protection of patients.[88]

Like the *Alternate Family Care* court, the court in *Valley Health System*, which applied both the *Alternate Family Care* factors and the additional four factors, *supra*, found that only two of the nine factors favored appointment of a PCO: (i) the patients were highly dependent on the debtor for their health, safety and welfare; and (ii) there was a high potential risk of injury to patients if the debtor drastically reduced the quality of care because the debtor's hospitals provided a

Proper Protection of Patients in Health Care Businesses In..., 44 No. 5 UCC L. J....

Case 18-40295    Doc 56-1    Filed 03/08/18    Entered 03/08/18 16:17:32    Desc Exhibit
Exhibit A    Page 7 of 19

variety of services (i.e., cancer treatment, surgical and pediatric services, and critical care). [89] Despite these findings, the *Valley Health System* court held that the appointment of a PCO was unnecessary because: (i) the bankruptcy filing did not arise from, and it would not compromise, the quality of patient care; (ii) the debtor is monitored by various federal and state regulatory agencies; (iii) there is no evidence that the debtor is unable to continue providing the highest quality of patient care, and it has extensive internal procedures to resolve complaints concerning patient care; and (iv) appointment of a PCO would be an unnecessary added expense and would be redundant because the debtor is already heavily regulated and supervised. [90]

While both the *Alternate Family Care* and *Valley Health System* courts found that two key factors favored appointment of a PCO—the level of dependency of the patients on the facility and the potential injury to the patients if the debtor drastically reduced its level of patient care—these courts still found that the other factors weighed against the appointment of a PCO. [91] Despite the arguments lodged by the U.S. Trustee, the *Valley Health* court did not appoint a PCO. [92]

One bankruptcy court, in at least two separate and distinct cases, applied only the four *Collier* factors and held that appointment of a PCO was unnecessary because: (i) the debtor provided only outpatient care, which "lessens the need for the appointment of a PCO to insure a continuity of day-to-day care for patients;" (ii) the debtor has an internal ombudsman program in place to handle patient complaints; and (iii) the debtor is in compliance with regulatory agency agreements. [93]

After examining the cases involving PCOs published to date, it appears a trend exists—courts frequently ignore the statutory presumption that a PCO must be appointed when a health care business files for bankruptcy by placing significant weight on factors such as the existence of internal safeguards [94] and financial burden imposed on the bankruptcy estate, and by treating factors that weigh in favor of the appointment of a PCO [95] as *de minimis*. Stated differently, the courts are giving short shrift to the interests of patients and placing a premium on the economic effect on the estate. This order of priorities seems to conflict with Congressional intent to elevate the interests of patients over all other competing factors. In sum, Congress focused on saving the lives of people; the courts have focused on saving the lives of the businesses.

**b. Courts Should Not Accord Significant Weight to the Absence of Pre-petition Patient Care Issues**

The PCO is appointed to monitor and report the quality of patient care throughout the bankruptcy case. Some debtors argue that the bankruptcy filing does not adversely affect the quality of the patient care that was being provided pre-petition. [96] Patient care issues can occur at any time. Even if the court does not initially appoint a PCO, it may still order the appointment at a later time under Bankruptcy Rule 2007.2(b), [97] on the motion of the UST or a party in interest, if the court finds that the appointment has become necessary to protect the debtor's patients. [98] Thus, courts should not accord significant weight to pre-petition quality of patient care when determining whether the appointment of a PCO is necessary.

**2. Courts Should Place Less Weight on the Cost of a PCO When Determining Whether Appointment Is Necessary**

Most courts consider the cost of a PCO as a significant factor that weighs strongly against the appointment of a PCO. [99] Opponents of appointment of a PCO are concerned with "over-zealous ombudsman reacting to patient conditions that do not reach the life threatening level." [100] Section 330, which sets forth the bankruptcy court's authority to award reasonable compensation or deny compensation, should alleviate their concerns. [101]

In determining whether to appoint a PCO, the United States Trustee—like the *Alternate Family Care* court—believes that a totality of the circumstances approach is appropriate. [102] However, the USTP disagrees with the ninth factor set forth by the *Alternate Family Care* court—the cost of a PCO—which unlike the first eight factors, does not relate directly to patient care. [103] According to the UST, the cost of a PCO "should not be a controlling criteria for appointment." [104]

A PCO's interests are not necessarily synonymous with the economic interests of other parties, such as creditors and the debtor. [105] Because a PCO's primary duty is to serve as an advocate for the patients, a PCO may urge the court to require the debtor to "take costly measures that will deplete rather than enhance the estate and the ultimate recovery of creditors." [106] However, the benefits that a PCO could potentially provide to patients and the court outweigh the potential risk of an overzealous PCO and the economic burden imposed on the bankruptcy estate.

Although there are some cases in which a PCO is truly unnecessary, the lack of pre-petition patient problems, the presence of state and federal oversight, and the cost of a PCO should not automatically excuse the appointment of a PCO. As between maximizing life versus maximizing distributions to creditors, the former should control.

## IV. Compensation of a PCO

Under § 330(a)(1) of the Code, a court may award a PCO appointed under § 333 reasonable compensation for actual, necessary services rendered and reimbursement for actual, necessary expenses. [107] Courts have discretion to determine the appropriate amount of compensation. [108] The Code grants a court the authority—either *sua sponte* or on the motion by the UST, the trustee, or a party in interest—to award compensation that is less than the amount of compensation that has been requested by the PCO. [109] In determining "reasonable compensation" of a PCO, courts must consider six factors:

(A) the time spent on such services;

(B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with complexity, importance, and nature of the problem, issue, or task addressed;

(E) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title. [110]

Furthermore, the Code states that the court is required to deny compensation for unnecessary duplication of services or for services that are neither reasonably likely to benefit the debtor's estate nor necessary. [111] A PCO's compensation is generally paid for by the bankruptcy estate, unless otherwise ordered by the court. [112]

The above referenced factors are fair and reasonable. What is not fair and reasonable is when the PCO is entitled to receive compensation. Section 331 authorizes interim compensation to persons employed under section 327 or 1103, but not PCOs employed under section 333. Congress should amend § 331 [113] to expressly permit interim compensation for PCOs. Denying interim compensation may discourage qualified PCOs from taking on new cases, especially if the PCO has to

Case 18-40295   Doc 56-1   Filed 03/08/18   Entered 03/08/18 16:17:32   Desc Exhibit
Exhibit A   Page 9 of 19

Proper Protection of Patients in Health Care Businesses in..., 44 No. 5 UCC L. J....

front the expenses. [114] Although section 331 does not state that PCOs are entitled to interim compensation, [115] some courts have considered the potential detrimental effects of denying interim compensation and employed their equitable powers under § 105 to grant the PCO's interim fee application. [116]

In *Haven Eldercare*, the court held that a PCO appointed under § 333 is "entitled to have compensation awarded under § 330(a)(1), but is conspicuously absent from the universe of individuals entitled to *interim* compensation under Section 331." [117] When the court subsequently used its equitable powers under § 105 [118] to grant the PCO's application for interim compensation, it focused on the effects of delayed compensation. [119]


### V. PCOs Should be Expressly Authorized to Employ and Compensate Professionals

PCOs lack statutory authority to employ counsel and other professionals; however, section 327(a) of the Code authorizes a bankruptcy trustee to employ professionals to help the trustee in carrying out its responsibilities with the court's approval. [120] Congress did not amend § 327 to authorize a PCO to employ professionals. [121] Moreover, the legislative history of § 333 does not indicate that a PCO is authorized to retain professionals. [122]

Although Congress amended § 330 to provide for compensating and reimbursing expenses of a PCO, it failed to include a provision addressing the issue of compensating professionals employed by a PCO. [123] Nevertheless, some courts have found that the Code authorizes a PCO to employ counsel in certain circumstances. [124] There is split authority on which subsection of § 327 authorizes the PCO to employ counsel. [125] Some courts believe that § 330(a)(1)(A) applies to any professionals approved by the court under Rule 2014; thus, the professionals employed by the PCO can be compensated from the estate. [126] Other courts, however, adopt a different view—holding that § 330(a)(1)(B) applies instead of § 330(a)(1)(A). [127] Under this analysis, the professionals employed by the PCO are not directly compensated from the estate, so the PCO must compensate them and then seek reimbursement. [128] The *Haven Eldercare* court adopts the latter view. [129] The court also noted that the PCO may not obtain reimbursement for the fees and expenses incurred by his or her professional on an interim basis under § 331. [130]

If the court adopts the latter view—that § 330(a)(1)(B), not § 330(a)(1)(A) is the applicable subsection—then the PCO should be quickly reimbursed by the estate, so qualified individuals are not discouraged from serving as a PCO.

The UST also supports authorizing PCOs to retain professionals "on a showing of need" because there are certain circumstances in which it may be necessary for a PCO to employ counsel. [131] Alternatively, the UST notes that the "fees and expenses of counsel could reasonably be deemed to be an 'actual, necessary' expense reimbursable under § 330(a)(1)(B)." [132]

It is conceivable that retention of counsel by a PCO is necessary under some circumstances, such as when a PCO files motions or "becomes involved in an evidentiary hearing defending a determination that the quality of health care is declining." [133] A PCO is "typically a medical doctor or other medical professional with firsthand knowledge of quality medical care" [134] because he/she needs to possess the qualifications to carry out the PCO's duties—to monitor the quality of patient care. "It is doubtful every suitable candidate for the ombudsman role will possess not only the qualifications necessary to 'monitor the quality of patient care' but also the expertise necessary to prepare legal documents and appear in court …." [135]

Thus, Congress should amend the Code to expressly enable courts (1) to authorize PCOs to employ professionals; and (2) to require that these professionals be compensated from the estate.

Case 18-40295   Doc 56-1   Filed 03/08/18   Entered 03/08/18 16:17:32   Desc Exhibit
Exhibit A   Page 10 of 19

Proper Protection of Patients in Health Care Businesses ID..., 48 No. 3 UCC L. J....

In cases in which it is unclear whether appointment of a PCO is absolutely necessary, courts should consider requiring the debtor to periodically self-report the status of the patient care.

In one case, the debtor agreed to file with the court a verified affidavit every 60 days, in lieu of appointing a PCO. [136] Voluntary self-reporting can be a less financial burden on the bankruptcy estate than appointment of a PCO and could achieve the same results. However, voluntary self-reporting depends on the veracity and diligence of the debtor.

Although the court in *In re Bamberg County Memorial Hospital* held that appointment of a PCO was unnecessary for the health care business debtor, it directed the debtor to report patient complaints and any reports or other actions taken by a regulatory agency to the United States Trustee's Office on a monthly basis "to ensure that if a change circumstances occurs, a patient care ombudsman could be appointed at that time." [137]

There are only a few cases in which this alternative has been utilized, but courts should consider this as a viable option.


## VI. Conclusion

Even after 6½ years since BAPCPA has been in effect, there are still many questions that have not been answered. Congress should amend the Code to prevent courts from applying the statute in a way which is contrary to Congress' intent to protect patients' interests.


Westlaw. © 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.


Footnotes

\*      U.S. Bankruptcy Judge for the Southern District of Texas. Judge Bohm was appointed December 30, 2004.
       J.D. Candidate 2012, University of Houston Law Center; B.A. Vanderbilt University. Jennifer Chang will begin her clerkship for Bankruptcy Judge Jeff Bohm in August 2013. She has previously published two reports for Corpus Christi's Commission for Children and Youth regarding juvenile delinquency risk factors.

1      U.S. Gov't Accountability Office, T-HEHS-00-192, Nursing Homes: Aggregate Medicare Payments are Adequate Despite Bankruptcies 1 (2000); Nursing Home Bankruptcies Before the S. Spec. Comm. on Aging, 106th Cong. 1 (2000) (statement of Steven Pelovitz, Director, Survey and Certification Group, Health Care Financing Administration, U.S. Department of Health and Human Services), available at http://aging.senate.gov/events/hr57sp.pdf ("[T]his means that organizations in their entirety are continuing to operate nursing homes, as well as other lines of business, while restructuring financial components of the company.").

2      Linda Stern, Bankruptcies Hit Retirement Communities: Elderly Residents who Thought They'd Secured Their Futures are Finding Their Homes and Savings at Risk, The Daily Beast (Nov. 23, 2009, 7:00 PM), http://www.thedailybeast.com/newsweek/2009/11/23/bankruptcies-hit-retirement-communities.html (describing large retirement communities that recently declared bankruptcy and noting that smaller retirement communities are "raising their prices, changing the way they operate, selling themselves off to bigger chains, or getting out of the business altogether" because they are no longer profitable).

3      *See* 151 Cong. Rec. S1857 (daily ed. Mar. 1, 2005) (statement of Sen. Grassley).
       At a hearing I held on nursing home bankruptcies, I learned about a situation in California where a bankruptcy trustee just showed up at a nursing home on a Friday evening and evicted the residents of that nursing home. The bankruptcy trustee didn't provide any notice whatsoever that this was going to happen. There was absolutely no chance for the nursing home residents to be relocated. The bankruptcy trustee literally put these elderly people out on the street and changed the locks on the doors so that they couldn't get back into the nursing home. The bankruptcy bill will prevent this from ever happening again. These are protections that we will be giving these deserving senior citizens for the first time.

4      Preserving the Quality of Patient Care in Health Care Bankruptcies: Hearing on S. 1914, The Business Bankruptcy Reform Act Before the Subcomm. On Admin. Oversight and the Courts of the S. Comm. on the Judiciary, 105th Cong. 4 (1998) [hereinafter Shapiro Testimony] (summary of key points in testimony of Keith Shapiro, American Bankruptcy Institute).

5    Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) (codified as amended in scattered sections of 11 U.S.C.A. §§ 101 et al.).

6    Shapiro Testimony, *supra*, at 10.

7    Shapiro Testimony, *supra*, at 10.

8    *See* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1104, 119 Stat. 23, 191 (2005). Congress enacted BAPCPA on April 20, 2005. Section 1104, entitled "Appointment of Ombudsman to Act as Patient Advocate," is codified under the title "Appointment of Patient Care Ombudsman." 11 U.S.C.A. § 333.

9    11 U.S.C.A. § 333(a)(1) (emphasis added).

10   Admin. Office of the U.S. Courts, Bankruptcy Statistics, United States Courts, http://www.uscourts.gov/uscourts/Statistics/BankruptcyStatistics/BankruptcyFilings/2011/0611_f2.pdf (last visited Jan. 22, 2012) ("If the debtor is a corporation or partnership, or if debt related to operation of a business predominates, the nature of the debt is business.").

11   Karen Redmond, Bankruptcy Filings Down from 2010 Levels, Admin. Office of the U.S. Courts, Bankruptcy Statistics, United States Courts (Aug. 5, 2011), http://www.uscourts.gov/News/NewsView/11-08-05/Bankruptcy_Filings_Down_From_2010_Levels.aspx; Admin. Office of the U.S. Courts, Bankruptcy Statistics, United States Courts, http://www.uscourts.gov/Statistics/BankruptcyStatistics.aspx (last visited Jan. 22, 2012). According to statistics released by the Administrative Office of the U.S. Courts, business bankruptcy petitions filed in the 12-month period ending June 30, 2011, totaled 52,134, an increase of 60.9% from the 32,406 business bankruptcy petitions filed in the 12-month period ending June 30, 2005. Id.

12   Id. According to statistics released by the Administrative Office of the U.S. Courts, 59,608 business bankruptcy petitions were filed in the 12-month period ending June 30, 2010, a decrease of 12.5% from the number of business bankruptcy petitions filed in the 12-month period ending June 30, 2011. Id.

13   *See generally* Lawrence R. Plavnick, The Impact of Health Care Business Bankruptcies on Patient Care, HealthCare Review Northeast Network (Nashua, N.H.) (Sept. 30, 2010), http://www.healthcarereview.com/2010/09/the-impact-of-health-care-business-bankruptcies-on-patient-care/ ("It is therefore not surprising to see an increase in the number and visibility of health care business bankruptcies ...."); Joseph M. Gitto & Robert Christmas, Bankruptcies of Health-care-related Businesses are on the Rise, Bankruptcy Law Alert: Developments in Bankruptcy Law, Nixon Peabody, LLP, 1 (Oct. 10, 2007), http://www.nixonpeabody.com/linked_media/publications/BankruptcyAlert_10102007.pdf ("In recent years, there has been a marked increase in bankruptcy cases involving health-care-related businesses and hospitals.").

14   *See* Allan Rubin, Nursing Home Bankruptcies, TheRubins.com, (Dec. 5, 2008), http://www.therubins.com/homes/gettingin.htm (last updated Sept. 21, 2011) ("The difficult economic environment that we are in right now is taking its toll on almost all industries including the nursing home and assisted living companies.").

15   Throughout this Comment, any reference to "debtor" means reference to the entity that filed the bankruptcy petition. *See* Black's Law Dictionary (9th ed.) (defining "debtor" as "[a] person who files a voluntary petition or against whom an involuntary petition is filed").

16   Timothy M. Lupinacci & Eric L. Pruitt, New Player at the Health Care Reorganization Table: Practical Implications of the Patient Care Ombudsman, 24 Am. Bankr. Inst. J. 26, 56 (2005) ("The health care amendments were originally conceived as part of the failed Business Bankruptcy Reform Act of 1998, S. 1914 (1998 Bill)."). Senator Grassley stated that the 1998 Bill allows bankruptcy judges to appoint PCOs "to make sure that the bankruptcy process is fair to patients." Id. (citing 105 Cong. Rec. S3129 (daily ed. Apr. 2, 1998) (statement of Sen. Grassley)).

17   Shapiro Testimony, *supra* note 4 at 10.

18   Shapiro Testimony, *supra* note, 4 at 10 (citing Older Americans Act of 1965, Pub. L. No. 89–73, 79 Stat. 218 (1995)).

19   Shapiro Testimony, *supra* note, 4 at 10.
     The ombudsman's only duty is to monitor the quality of patient care. The ombudsman then reports to the court every 60 days regarding the quality of patient care. In the interim, if any serious matters transpire and the quality of patient care declines significantly or is otherwise materially compromised, the ombudsman may notify the court, by report or motion, with notice to the appropriate parties. Id.

20   11 U.S.C.A. § 333(a)(2)(B) ("If the debtor is a health care business that provides long-term care, then the United States trustee *may* appoint the State Long-Term Care Ombudsman appointed under the Older Americans Act of 1965 ....") (emphasis added). Henceforth, any reference to section 333 and other sections is a reference to 11 U.S.C.A., which is the Code.

21   However, the U.S. trustee may elect to appoint a PCO, rather than a SLTCO, if the debtor is a health care business that provides long-term care. 11 U.S.C.A. § 333(b)(2)(C).

22   11 U.S.C.A. §§ 333(b), (c)(1).
     An ombudsman appointed under subsection (a) shall—

Case 18-40295   Doc 56-1   Filed 03/08/18   Entered 03/08/18 16:17:32   Desc Exhibit
Exhibit A   Page 12 of 19

Proper Protection of Patients in Health Care Businesses in..., 48 No. 3 UCC L. J.....

(1) monitor the quality of patient care provided to patients of the debtor, to the extent necessary under the circumstances, including interviewing patients and physicians;

(2) not later than 60 days after the date of appointment, and not less frequently than at 60-day intervals thereafter, report to the court after notice to the parties in interest, at a hearing or in writing, regarding the quality of patient care provided to patients of the debtor; and

(3) if such ombudsman determines that the quality of patient care provided to patients of the debtor is declining significantly or is otherwise being materially compromised, file with the court a motion or a written report, with notice to the parties in interest immediately upon making such determination.

11 U.S.C.A. § 333(b); *see also* 11 U.S.C.A. § 333(c)(1) (stating that a PCO is required to maintain any patient-related information, including information relating to patient records, as confidential).

23   Peterman, Morissette and Koenig, The Patient Care Ombudsman's New Reality: Top 10 Issues Relating to Appointment of an Ombudsman after BAPCPA, 26 Am. Bankr. Inst. J. 22, 67 (2007).

24   See David N. Crapo, Of Patient Care Ombudsman and Asset Sales: 2008 Cases of Interest to Health Care Law Practitioners in Bankruptcy Cases, ABI Health Care Committee Newsl. (Am. Bankr. Inst., Alexandria, Va.), July 2008, available at http://www.abiworld.org/committees/newsletters/health/vol5num4/patientcare.html (describing how the PCO in In re Brotman Medical Center Inc. and the hospital debtor cooperated toward a successful reorganization. The PCO in this case (i) visited the debtor's facilities seven times, including announced and unannounced visits; (ii) met with management, department heads, staff, physicians and patients to discuss patient care issues; (iii) urged the court to approve debtor-in-possession financing and the debtor's use of cash collateral; (iv) urged the court to consider the funding needs for supplies and medical staff; and (v) urged the court to consider the risks to the debtor's patients of transfer trauma if the debtor was forced to close its business due to lack of funding). Id.

25   *See also* discussion infra Part III B.1.a; Lupinacci & Pruitt, *supra* note 16, at 56–57 ("Theoretically every aspect of a health care facility—resident conditions, staffing, use of cash—is already addressed by state and federal regulatory oversight.").

26   The United States Trustee's Office is part of the Justice Department. The United States Trustee is charged with ensuring the integrity of the bankruptcy process. U.S. Tr. Program, U.S. Dep't of Justice, About the United States Trustee Program & Bankruptcy, U.S. Department Just., http://www.justice.gov/ust/eo/ust_org/index.htm (last visited Jan. 27, 2012). It has standing to raise any issue in the bankruptcy court. 11 U.S.C.A. § 307 (1986) ("The United States trustee may raise and may appear and be heard on any issue in any case or proceeding under this title ....").

27   11 U.S.C.A. § 101(14) defines "disinterested person" as a person that:

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

28   11 U.S.C.A. § 333(2)(A).

29   Peterman et al., *supra* note 23, at 67. State departments of health ensure that health care businesses are in compliance with a minimum standard of patient care by, inter alia, conducting inspections of the facilities on a regular basis, reviewing and investigating patient complaints and incidents, and requiring the facilities to submit financial statements. See generally Tex. Health & Safety Code Ann. § 252.041 (1997) (stating that the Texas Department of Human Services is required to conduct at least two unannounced inspections); N.Y. State Dep't of Health, Complaints about Nursing Home Care, New York St. Department of Health, http://www.health.ny.gov/facilities/nursing/complaints.htm (last modified Jan. 2012) ("The New York State Department of Health, Division of Residential Services (DRS) is responsible for investigating complaints and incidents for nursing homes in New York State, which are related to State and/or Federal regulatory violation."); 28 Pa. Code § 912.61-62 (1998) (stating that hospital and ambulatory service facilities are required to file annual audited financial statements and quarterly summary utilization and financial reports).

30   Peterman et al., *supra* note 23, at 67.

31   11 U.S.C.A. § 101(27A)(A).

Proper Protection of Patients in Health Care Businesses in..., 48 No. 5 UCC L. J....

The term "health care business"—means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the *general public* facilities and services for (i) the diagnosis or treatment of injury, deformity, or disease; and (ii) surgical, drug treatment, psychiatric, or obstetric care ...."

11 U.S.C.A. § 101(27A)(A) (emphasis added).

32 See 11 U.S.C.A. § 333.

33 See In re: Vartanian, 2007 WL 4418163 (Bankr. D. Vt. 2007); In re Total Woman Healthcare Center, P.C., 47 Bankr. Ct. Dec. (CRR) 143, 57 Collier Bankr. Cas. 2d (MB) 603, 2006 WL 3708164, *3 (Bankr. M.D. Ga. 2006).

34 See discussion infra Part III.B.

35 See 11 U.S.C.A. § 333; In re Medical Associates of Pinellas, L.L.C., 360 B.R. 356, 362, 45 Bankr. Ct. Dec. (CRR) 165, 57 Collier Bankr. Cas. 2d (MB) 665, 33 A.L.R. Fed. 2d 769 (Bankr. M.D. Fla. 2007); In re Banes, 355 B.R. 532, 536, 57 Collier Bankr. Cas. 2d (MB) 190, Bankr. L. Rep. (CCH) P 80797 (Bankr. M.D. N.C. 2006); In re 7-Hills Radiology, LLC, 350 B.R. 902, 905–06 (Bankr. D. Nev. 2006).

36 *See generally* In re Starmark Clinics, LP, 388 B.R. 729, 732, 734, 49 Bankr. Ct. Dec. (CRR) 251, 59 Collier Bankr. Cas. 2d (MB) 914, 59 Collier Bankr. Cas. 2d (MB) 1259, Bankr. L. Rep. (CCH) P 81220 (Bankr. S.D. Tex. 2008) (holding that the debtor's "cosmetic" services outpatient clinic—which provided acne removal, laser treatment, and injections—was a health care business because it "offer[ed] to the general public facilities and services for the diagnosis and treatment of physical injury, deformity, or disease, by, inter alia, the injection of foreign substances into the body"); Keith J. Shapiro, Nancy A. Peterman & David Y. Wolnerman, Turmoil in the Healthcare Industry: What about the Patients?, The Americas Restructuring and Insolvency Guide 2008/2009, 102 (May 22, 2008), http://www.americasrestructuring.com/08_SF/p100–106%20Turmoil%20in%20the%20healthcare%20industry.pdf (discussing how the court in In re Elan Senior Living Inc. held that the debtor's outpatient and residential counseling facility was not a health care business because the goal of the services was to control the behavior of addicts, and not to cure a disease).

37 See 11 U.S.C.A. § 101(27A)(A); *Pinellas*, 360 B.R. at 359 (setting forth a formal four-part test for determining whether a debtor qualifies as a health care business under § 101(27A)(A)).

38 § 101(27A).

39 See § 101(27A)(A), *supra* note 31.

40 *Pinellas*, 360 B.R. at 359–60.

41 *Pinellas*, 360 B.R. at 359–60.

42 In re 7-Hills Radiology, LLC, 350 B.R. 902, 904 (Bankr. D. Nev. 2006) ("No member of the general public [could] walk in and request an X-ray or any other procedure [the debtor] perform[ed] … This limitation of its business to referring physicians takes it out of the definition of health care business."). *But see* In re Genesis Hospice Care LLC, 51 Bankr. Ct. Dec. (CRR) 104, Bankr. L. Rep. (CCH) P 81442, 2009 WL 467265, *1–2 (Bankr. N.D. Miss. 2009) (finding that the debtor, who provided outpatient medical care upon physician, hospital, nursing home, or community referrals, was a health care business).

43 7-Hills Radiology, 350 B.R. at 904.

44 In re RAD/ONE, P.A., Bankr. L. Rep. (CCH) P 81431, 2009 WL 467286, *1 (Bankr. N.D. Miss. 2009). However, the court did not analyze the four elements of § 101(27A)(A). Id.

45 In re Alternate Family Care, 377 B.R. 754, 757, 58 Collier Bankr. Cas. 2d (MB) 1531, Bankr. L. Rep. (CCH) P 81057 (Bankr. S.D. Fla. 2007).

46 *In re Alternate Family Care*, 377 B.R. at 757–58.

47 *In re Alternate Family Care*, 377 B.R. at 758.

48 Sandeep Jauhar, Referral System Turns Patients into Commodities, N.Y. Times (May 25, 2009), http://www.nytimes.com/2009/05/26/health/26essa.html?_r=1&ref=health ("Studies suggest that physicians receive up to 45% of new patients by referral, usually from other physicians.").

49 11 U.S.C.A. § 101(27A)(B). A health care business includes (i) any—(I) general or specialized hospital; (II) ancillary ambulatory, emergency, or surgical treatment facility; (III) hospice; (IV) home health agency; and (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and (ii) any long-term care facility, including any—(I) skilled nursing facility; (II) intermediate care facility; (III) assisted living facility; (IV) home for the aged; (V) domiciliary care facility; and (VI) health care institution that related to a facility to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.
Id.

50    See *U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242, 109 S. Ct. 1026, 103 L. Ed. 2d 290, 18 Bankr. Ct. Dec. (CRR) 1150, Bankr. L. Rep. (CCH) P 72575, 89–1 U.S. Tax Cas. (CCH) P 9179, 63 A.F.T.R.2d 89–652 (1989) ("The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S. Ct. 3245, 73 L. Ed. 2d 973, 1982 A.M.C. 2377 (1982)).

51    *See In re Banes*, 355 B.R. 532, 535, 57 Collier Bankr. Cas. 2d (MB) 190, Bankr. L. Rep. (CCH) P 80797 (Bankr. M.D. N.C. 2006) ("Subsection (B) is also connected to subsection (A) with the conjunctive "and," which means that the Debtor's dental practice must also fit within the categories of health care businesses described in § 101(27)(B)(i)(I) to (V) or (B)(ii)(I) to (VI) to be considered a health care business."); *In re William L. Saber, M.D., P.C.*, 369 B.R. 631, 636, 48 Bankr. Ct. Dec. (CRR) 110, Bankr. L. Rep. (CCH) P 80952 (Bankr. D. Colo. 2007) ("Thus a debtor who is a 'health care business' must meet every requirement under both subsections for a patient care ombudsman to be appointed.").

52    *See In re Alternate Family Care*, 377 B.R. at 757. ("AFC does not fit into any of the businesses listed in § 101(27A)(B). Therefore, for AFC to be considered a healthcare business it must meet the § 101(27A)(A) definition.").

53    11 U.S.C.A. § 102(3) ("In this title … 'includes' and 'including' are not limiting."). See also *In re Saber*, 369 B.R. at 637 (noting that § 101(27A)(B) is not an exhaustive list of entities because the word "includes" at the beginning of subsection (B) is not limiting).

54    See *In re 7-Hills Radiology, LLC*, 350 B.R. 902, 905 (Bankr. D. Nev. 2006) (Section 101(27A)(B) "seem[s] to indicate a restrictive range for health care businesses."). Although the 7-Hills Radiology court recognized that the term "includes" is not limiting under § 102(3), it states that the court must consider the canon of noscitur a sociis—translated as "it is known from its associates"—which means the court should "look to the language surrounding—or associated with—the language in question to determine the meaning of a disputed word or phrase." *Id.* at 904. See also *In re Medical Associates of Pinellas, L.L.C.*, 360 B.R. 356, 360, 45 Bankr. Ct. Dec. (CRR) 165, 57 Collier Bankr. Cas. 2d (MB) 665, 33 A.L.R. Fed. 2d 769 (Bankr. M.D. Fla. 2007) ("[A] general definition followed by a number of examples implies that it is description of the type of business that is meant to be included within the general definition.").

55    *7-Hills Radiology*, 350 B.R. at 905 ("That is the almost inescapable conclusion one draws from the focus on institutions in which patients are housed and treated."). The court in *Banes* used this conclusion to determine that the debtor was not a health care business because the outpatient dental practice was "fundamentally different" from the types of facilities listed in § 101(27A)(B) and was "plainly not within the range of health care businesses anticipated by the statute." *In re Banes*, 355 B.R. at 535.

56    Nancy A. Peterson, Sherri Morrisette & Suzanne Koenig, Why so Many Excuses to Avoid the Appointment of a Patient Care Ombudsman?, ABI Health Care Committee Newsl., 3 (August 2007), available at http://www.abiworld.org/committees/ newsletters/health/vol4num3/HealthCare3.pdf (describing that the U.S. Trustee in In re Dari Ann Ungaretti argued that the debtor is a health care business because it was still performing surgical procedures on patients).

57    See 11 U.S.C.A. § 101(27A). The "health care business" definition does not expressly require the entity to provide patients with "direct and ongoing contact" or "shelter and sustenance in addition to medical treatment." Id.

58    11 U.S.C.A. § 101(27A)(B)(i)(II).

59    Amy B. Bernstein et al., Nat'l Ctr. for Health Statistics, Health Care in America: Trends in Utilization 126 (2003), available at http://www.cdc.gov/nchs/data/misc/healthcare.pdf ("[T]he term 'ambulatory care' usually implies that the patient must travel to a location to receives services that do not require an overnight stay.").

60    11 U.S.C.A. § 101(27A)(B)(i)(IV).

61    Christine Caffrey et al., Nat'l Ctr. for Health Statistics, Home Health Care and Discharged Hospice Care Patients: United States, 2000 and 2007, Nat'l Health Statistics Reports 1 (April 27, 2011).

62    *In re Medical Associates of Pinellas, L.L.C.*, 360 B.R. 356, 361, 45 Bankr. Ct. Dec. (CRR) 165, 57 Collier Bankr. Cas. 2d (MB) 665, 33 A.L.R. Fed. 2d 769 (Bankr. M.D. Fla. 2007).

      [I]n the Senate discussions of the original versions of the health care amendments that appeared in the Bankruptcy Reform Act of 1999 (which are virtually the same as the BAPCPA amendments), Senator Charles E. Grassley stated, "I was shocked to realize that the Bankruptcy Code doesn't require bankruptcy trustees and creditor committees to consider the welfare of patients *when closing down or reorganizing a hospital or nursing home*. So, under the [Bankruptcy Reform Act of 1999] *whenever a hospital or nursing home declares bankruptcy*, a patient ombudsman will be appointed to represent the interest of patients during bankruptcy proceedings."

      Id. (emphasis in original) (citing 145 Cong. Rec. S2739) (daily ed. Mar. 16, 1999) (statement of Sen. Grassley)

63    See generally *In re Genesis Hospice Care LLC*, 51 Bankr. Ct. Dec. (CRR) 104, Bankr. L. Rep. (CCH) P 81442, 2009 WL 467265, *1–2 (Bankr. N.D. Miss. 2009) (debtor provided only outpatient medical care to patients in their homes or nursing

homes); In re RAD/ONE, P.A., Bankr. L. Rep. (CCH) P 81431, 2009 WL 467286, *1 (Bankr. N.D. Miss. 2009) (debtor provided only outpatient radiological services); In re North Shore Hematology-Oncology Associates, P.C., 400 B.R. 7, 9, 12, 50 Bankr. Ct. Dec. (CRR) 267, Bankr. L. Rep. (CCH) P 81378 (Bankr. E.D. N.Y. 2008) (debtor's health care practice providing services in areas of cancer treatment and blood disorders did not provide any in-patient services).

64  In re William L. Saber, M.D., P.C., 369 B.R. 631, 637, 48 Bankr. Ct. Dec. (CRR) 110, Bankr. L. Rep. (CCH) P 80952 (Bankr. D. Colo. 2007) (holding that the debtor's single-physician plastic surgery practice was a health care business because it met the four elements under § 101(27A)(A) and it was a "surgical treatment facility" under § 101(27A)(B), even though the doctor performed surgeries in his office with a local anesthesia).

65  DeAngelis and Bridenhagen, The United States Trustee Program Administers BAPCPA's Patient Care Ombudsman Requirements, 27 Am. Bankr. Inst. J. 14, 44–45 (2008) (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 504, 119 S. Ct. 2139, 144 L. Ed. 2d 450, 9 A.D. Cas. (BNA) 673 (1999), overturned due to legislative action, in U.S. Pub.L. 110-325 (Jan. 1, 2009) ("It has long been a 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.'").

66  11 U.S.C.A. § 333(a)(1) (emphasis added).

67  See Michael S. Kogan, Understanding the Current Chapter 7 Environment, 2010 WL 895209 (ASPATORE), *1 (March 2010) ("Chapter 7 is quite different from Chapter 11, because in a Chapter 7 bankruptcy case the business owners no longer want to operate the business and there is generally little or no hope of retaining the assets by the owners of the business."). The only logical reason for § 333 to apply to Chapter 7 cases would be in those instances where after the filing of the Chapter 7 petition, the trustee assigned to the case concludes that the health care facility has sufficient value as an ongoing business that it is worthwhile to keep operations going while the trustee searches for a buyer who is willing to pay a price sufficient such that creditors of the Chapter 7 estate receive payment on their claims, in part if not in whole. These types of Chapter 7's, although not frequent, are commonly known as "operating Chapter 7's." See 11 U.S.C.A. § 721 ("The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate."); Am. Jur. 2d, Bankruptcy § 1654 ("Thus, even though the commencement of the Chapter 7 case, or a conversion to Chapter 7 from another Chapter, contemplates the total liquidation of that portion of the debtor's property that is available for distribution to creditors, the continued operation of the business of the debtor for a limited period can serve the best interests of creditors.). See also In re Office Products of America, Inc., 136 B.R. 964, 974, 22 Bankr. Ct. Dec. (CRR) 991 (Bankr. W.D. Tex. 1992) ("[A]n operating chapter 7 takes on some of the trappings of an operating chapter 11, so that the debtor, though not in possession, still has to be actively involved in working with the lender.").

68  See In re Banes, 355 B.R. 532, 536, 57 Collier Bankr. Cas. 2d (MB) 190, Bankr. L. Rep. (CCH) P 80797 (Bankr. M.D. N.C. 2006) (holding that the appointment of a PCO was not required, even if the debtor qualified as a health care business, because the debtor had ceased operations and no longer had patients); In re Medical Associates of Pinellas, L.L.C., 360 B.R. 356, 362, 45 Bankr. Ct. Dec. (CRR) 165, 57 Collier Bankr. Cas. 2d (MB) 665, 33 A.L.R. Fed. 2d 769 (Bankr. M.D. Fla. 2007) (holding that the appointment of a PCO was not required—even if the debtor qualified as a health care business—because the debtor ceased its business and "there would be little or nothing for a patient care ombudsman to monitor or report on").

69  11 U.S.C.A. § 101(27A).

70  Banes, 355 B.R. at 535.

71  11 U.S.C.A. § 333(b).

72  DeAngelis & Bridenhagen, supra note 66, at 45. ("Thus, an appointment should be unnecessary in a chapter 7 case, unless the trustee obtains an order to operate the business under section 721.").

73  11 U.S.C.A. § 333(a)(1).

74  See generally In re Barnwell County Hosp., 2011 WL 5443025 (Bankr. D. S.C. 2011); In re Genesis Hospice Care LLC, 51 Bankr. Ct. Dec. (CRR) 104, Bankr. L. Rep. (CCH) P 81442, 2009 WL 467265 (Bankr. N.D. Miss. 2009); In re RAD/ONE, P.A., Bankr. L. Rep. (CCH) P 81431, 2009 WL 467286 (Bankr. N.D. Miss. 2009); In re North Shore Hematology-Oncology Associates, P.C., 400 B.R. 7, 50 Bankr. Ct. Dec. (CRR) 267, Bankr. L. Rep. (CCH) P 81378 (Bankr. E.D. N.Y. 2008); In re Valley Health System, 381 B.R. 756, 49 Bankr. Ct. Dec. (CRR) 164, 59 Collier Bankr. Cas. 2d (MB) 490, Bankr. L. Rep. (CCH) P 81120 (Bankr. C.D. Cal. 2008); In re William L. Saber, M.D., P.C., 369 B.R. 631, 48 Bankr. Ct. Dec. (CRR) 110, Bankr. L. Rep. (CCH) P 80952 (Bankr. D. Colo. 2007). According to statistics compiled by the UST, as of September 2007, appointment of a PCO was most likely in cases involving skilled nursing facilities ("SNF") (PCO was appointed in 64% of cases) and hospitals (PCO was appointed in 62% of cases), but a PCO was appointed in only 7.4% of cases involving all other types of health care businesses. See Kaplan and Maizel, The Evolving Standards for the Appointment of a Patient Care Ombudsman: § 333 in "Operation," 27 Am. Bankr. Inst. J. 40, 40 (2008).

75 In re Starmark Clinics, LP, 388 B.R. 729, 734, 49 Bankr. Ct. Dec. (CRR) 251, 59 Collier Bankr. Cas. 2d (MB) 914, 59 Collier Bankr. Cas. 2d (MB) 1259, Bankr. L. Rep. (CCH) P 81220 (Bankr. S.D. Tex. 2008); *see also* DeAngelis & Bridenhagen, *supra* at 45.

76 DeAngelis & Bridenhagen, *supra* at 45.

77 *See generally* In re Adams, 2011 WL 2946710, *1 (Bankr. N.D. Miss. 2011) (holding that a PCO was unnecessary because the debtor's "financial difficulties, which arose as a result of tax and alimony issues, have not, and should not, affect patient care"); In re Total Woman Healthcare Center, P.C., 47 Bankr. Ct. Dec. (CRR) 143, 57 Collier Bankr. Cas. 2d (MB) 603, 2006 WL 3708164, *2 (Bankr. M.D. Ga. 2006) (holding that a PCO was not necessary for the protection of patients because the bankruptcy filing arose from tax-related issues, not from deficient patient care, and patient care was not affected by the bankruptcy filing); *Saber*, 369 B.R. at 637 (holding that appointment of a PCO was unnecessary because, inter alia, the bankruptcy filing arose from a contractual dispute between the debtor and a former employee, and not from "concerns relating to the quality of patient care or patient privacy matters"). The *Saber* court also noted that the debtor had "sufficient procedures in place to enable it to continue to protect the privacy of its patients," and it was unlikely that the debtor's financial problems would affect the quality of patient care and privacy of its patients. *Saber*, 369 B.R. at 638.

78 In re Alternate Family Care, 377 B.R. 754, 758, 58 Collier Bankr. Cas. 2d (MB) 1531, Bankr. L. Rep. (CCH) P 81057 (Bankr. S.D. Fla. 2007).

79 See *supra* text accompanying note 78.

80 *Alternate Family Care*, 377 B.R. at 761.

81 *Alternate Family Care*, 377 B.R. at 761.

82 *Alternate Family Care*, 377 B.R. at 760. The court noted that the children under the debtor's care or supervision were highly dependent on the debtor. *Alternate Family Care*, 377 B.R. at 760.

83 Id. The court recognized that the children "could suffer severe trauma" if the debtor drastically reduced its level of patient care or closed its business. *Alternate Family Care*, 377 B.R. at 760.

84 *Alternate Family Care*, 377 B.R. at 759–61.

85 In re Valley Health System, 381 B.R. 756, 761, 49 Bankr. Ct. Dec. (CRR) 164, 59 Collier Bankr. Cas. 2d (MB) 490, Bankr. L. Rep. (CCH) P 81120 (Bankr. C.D. Cal. 2008).

86 See generally In re Barnwell County Hosp., 2011 WL 5443025 (Bankr. D. S.C. 2011); In re North Shore Hematology-Oncology Associates, P.C., 400 B.R. 7, 50 Bankr. Ct. Dec. (CRR) 267, Bankr. L. Rep. (CCH) P 81378 (Bankr. E.D. N.Y. 2008); In re Valley Health System, 381 B.R. 756, 49 Bankr. Ct. Dec. (CRR) 164, 59 Collier Bankr. Cas. 2d (MB) 490, Bankr. L. Rep. (CCH) P 81120 (Bankr. C.D. Cal. 2008); In re: Vartanian, 2007 WL 4418163 (Bankr. D. Vt. 2007).

87 *Valley Health Sys.*, 381 B.R. at 761 (citing 3 Collier on Bankruptcy, ¶333.02 (16th ed. 2011)).

88 *Valley Health Sys.*, 381 B.R. at 758–60.

89 *Valley Health Sys.*, 381 B.R. at 764 ("Moreover, a cessation of operations at any one of the [debtor's] hospitals would require a transfer of patients to another facility.").

90 *Valley Health Sys.*, 381 B.R. at 761, 765.

91 *Valley Health Sys.*, 381 B.R. at 765; In re Alternate Family Care, 377 B.R. 754, 761, 58 Collier Bankr. Cas. 2d (MB) 1531, Bankr. L. Rep. (CCH) P 81057 (Bankr. S.D. Fla. 2007).

92 *Valley Health Sys.*, 381 B.R. at 765. The UST in Valley Health argued that "'an independent ombudsman is required not only to monitor the quality of patient care and to report to the Court, but to warn the Court if patient care is declining or being compromised' and that '[t]here is no other party in this case that can fill this role.'" *Valley Health Sys.*, 381 B.R. at 765.

93 In re Genesis Hospice Care LLC, 51 Bankr. Ct. Dec. (CRR) 104, Bankr. L. Rep. (CCH) P 81442, 2009 WL 467265, *2 (Bankr. N.D. Miss. 2009); In re RAD/ONE, P.A., Bankr. L. Rep. (CCH) P 81431, 2009 WL 467286, *2 (Bankr. N.D. Miss. 2009). See also 3 Collier on Bankruptcy, ¶333.02 (16th ed. 2011).

94 The Valley Health court rejected the U.S.T.'s contentions that "internal controls and external oversight common to all sophisticated health care businesses are insufficient to protect patients' rights upon bankruptcy …." *Valley Health Sys.*, 381 B.R. at 765. The U.S. Trustee also argued that the debtor's employees were not "disinterested" with respect to patient interests. *Valley Health Sys.*, 381 B.R. at 765. See *supra* text accompanying note 27 (stating the definition of "disinterested").

95 For most health care businesses, two of the Alternate Family Care factors—the level of dependency of the patients on the facility and the potential injury to the patients if the debtor drastically reduced its level of patient care—favor the appointment of a PCO.

96 See generally In re Total Woman Healthcare Center, P.C., 47 Bankr. Ct. Dec. (CRR) 143, 57 Collier Bankr. Cas. 2d (MB) 603, 2006 WL 3708164, *2 (Bankr. M.D. Ga. 2006) ("[The debtor's] financial distress has not affected patient care. [The debtor] has the same staff as before the bankruptcy filing."). *See supra* text accompanying note 78.

See also Peterson et al., *supra* note 57, at 3 n.12 (describing how the court in In re Heartland Memorial Hospital LLC relied upon Total Woman Healthcare Center and held that the appointment of an ombudsman was unnecessary because: (i) the filing was not precipitated by patient care issues; (ii) the debtor did not expect to have any patient care issues; (iii) patient care had not been impacted since the bankruptcy filing; and (iv) the debtor understood privacy laws).

97    Fed. R. Bankr. P. 2007.2(b) ("[T]he court, on motion of the United States trustee or a party in interest, may order the appointment at a later time if it finds that the appointment has become necessary to protect patients.").

98    *See* In re North Shore Hematology-Oncology Associates, P.C., 400 B.R. 7, 10–11, 13, 50 Bankr. Ct. Dec. (CRR) 267, Bankr. L. Rep. (CCH) P 81378 (Bankr. E.D. N.Y. 2008). The court decided not to initially appoint a PCO because there were no present patient care issues and the court had discretion under Bankruptcy Rule 2007.2(b) to appoint a PCO at a later time, "if the Court finds a change in circumstances or is presented with newly discovered evidence that demonstrates the necessity of an ombudsman to monitor the quality of patient care and protect the interests of patients." Id.

99    See generally *N. Shore Hematology-Oncology Assocs., PC*, 400 B.R. at 13 ("The Court also is sensitive to the costs to the estate attendant to appointment of an ombudsman."); *Valley Health Sys.*, 381 B.R. at 764 ("The appointment of a patient care ombudsman may result in substantial administrative expense to the estate."); In re Alternate Family Care, 377 B.R. 754, 761, 58 Collier Bankr. Cas. 2d (MB) 1531, Bankr. L. Rep. (CCH) P 81057 (Bankr. S.D. Fla. 2007) ("The lack of cash and the inability to obtain financing from conventional sources are *clear indicators* that this case cannot afford an ombudsman.") (emphasis added). The debtor in In re Saber argued that its "financial projections predict positive cash flow during the pendency of the Debtor's bankruptcy case," so the court found it "unlikely that a financial crisis would impair the Debtor's ability to continue to provide quality medical care and to protect the privacy of its patients." In re William L. Saber, M.D., P.C., 369 B.R. 631, 638, 48 Bankr. Ct. Dec. (CRR) 110, Bankr. L. Rep. (CCH) P 80952 (Bankr. D. Colo. 2007).

100    Kevin A. Spainhour, Statutory Quixotics: Tilting Against the Health Care Business Amendments to the Bankruptcy Code, 24 Emory Bankr. Dev. J. 193, at 222 (noting that "[w]hile Congress did not indicate what constitutes adverse patient care, they very likely did not intend a grossly adverse standard.").

101    11 U.S.C.A. § 330; Jean R. Robertson, How can the Patient Care Ombudsman Ensure Appropriate Compensation?, 27 Am. Bankr. Inst. J. 30, 30 (2008) ("Such judicial oversight should help to alleviate concerns of the estate and its creditors regarding onerous expenses incurred by the PCO."); *see also* discussion infra Part IV.

102    DeAngelis & Bridenhagen, *supra* note 66, at 45 (setting forth a slightly different non-exhaustive list of factors that may be considered in determining whether a PCO is necessary for the protection of patients:

> (1) whether the debtor is operating; (2) whether the financial status of the debtor is sufficiently strong that there is not a likelihood it would cut back on services; (3) whether there is sufficient local, state, or federal oversight such that the patients' welfare is adequately monitored; (4) whether current staffing (medical or otherwise) is adequate and reliable; (5) whether the level of medical care is adequate to protect the health of the patients; (6) whether adequate nutrition is provided; (7) whether there is any history of inadequate patient care (under this category any past lawsuits or liabilities would be important indicia); (8) the level of vulnerability or dependency of patients; (9) the presence and sufficiency of internal safeguards to ensure appropriate level of care; (10) whether the facilities are adequately maintained; and (11) the factors surrounding the bankruptcy filing and the debtor's operations.

Id.

103    Id.

104    Id. ("Instead, costs may be managed by establishing a budget for a PCO. In reviewing the extent to which PCOs have increased costs to the estate, we note that, in general, the costs have not been significant.").

105    In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2 (Bankr. N.D. Tex. 2008).

106    In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2 (Bankr. N.D. Tex. 2008) ("The result is that the court and other parties cannot view a patient care ombudsman as they do a fiduciary whose job includes improving an estate's value.").

107    11 U.S.C.A. § 330(a)(1) ("[A]n ombudsman appointed under section 333" is among those professionals to which a court may award compensation."). Congress amended section 330 to provide for compensating and reimbursing expenses of a PCO. In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2 (Bankr. N.D. Tex. 2008).

108    11 U.S.C.A. § 330(a)(1) ("[T]he court *may* award to … an ombudsman appointed under section 333 ….") (emphasis added).

109   11 U.S.C.A. § 330(a)(2).

110   11 U.S.C.A. § 330(a)(3).

111   11 U.S.C.A. § 330(a)(4)(A).

112   Robertson, *supra*, at 30 ("Because the retention of the PCO is directed by the Code and approved by the court, one could reasonably presume that the fees for the PCO's services and surrounding expenses should be paid for by the bankruptcy estate, unless otherwise ordered by the court.").

113   Section 331 concerns interim compensation and should not be confused with section 333, which concerns whether a PCO should be appointed. 11 U.S.C.A. § 331.

114   Robertson, *supra*, at 31 ("Because of the unique responsibilities placed upon the PCO, there are relatively few qualified persons who possess the necessary skills and training needed to effectively perform the required tasks. Economic disincentives would further reduce an already limited subset of qualified professionals willing to take on this role.").

115   11 U.S.C.A. § 331 ("A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title is entitled to interim compensation."). Persons qualifying for interim compensation under § 331 may not apply more than once every 120 days unless the court permits otherwise. Id. However, courts frequently do so. *See* In re Niover Bagels, Inc., 214 B.R. 291, 293–94, 31 Bankr. Ct. Dec. (CRR) 833 (Bankr. E.D. N.Y. 1997).

While it is true that under section 331 of the Bankruptcy Code professional persons are ordinarily expected to file applications for interim compensation not more frequently than every 120 days, that practice can be modified upon a proper showing of cause. In fact, most attorneys in these lower middle-market cases will not take these cases on unless they receive at least one-half of what they anticipate their aggregate projected fees will be in these cases.

Id.

116   See In re Synergy Hematology-Oncology Medical Associates, Inc., 433 B.R. 316, 319–20, 52 Bankr. Ct. Dec. (CRR) 175, Bankr. L. Rep. (CCH) P 81697 (Bankr. C.D. Cal. 2010); *see also* Leslie J. Levinson et al., Current Issues in Healthcare Lending, Edwards Angell Palmer & Dodge, 16 n.10 (April 30, 2010), http://www.edwardswildman.com/files/Uploads/Documents/April30FoodforThought.pdf (citing In re Haven Eldercare, LLC, 382 B.R. 180, 183, 49 Bankr. Ct. Dec. (CRR) 156 (Bankr. D. Conn. 2008); Our Lady of Mercy Med., et al., Case No. 07-10609 (Bankr. S.D.N.Y.); In re TSG, Inc., 2007 WL 1461764 (Bankr. E.D. Okla. 2007); Johnson v. Parker Hughes Clinics, 2005 WL 102968 (D. Minn. 2005)).

117   *Haven Eldercare*, 382 B.R. at 183 (emphasis in original). "The court initially rejected the PCO's interim compensation application but subsequently allowed it." Leslie J. Levinson et al., *supra* note 117, at 16 n.10 (citing In re Haven Eldercare, LLC, 382 B.R. 180, 49 Bankr. Ct. Dec. (CRR) 156 (Bankr. D. Conn. 2008)).

118   11 U.S.C.A. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").

119   Robertson, *supra* note 102, at 58 ("The PCO in In re Haven Eldercare argued that the PCO position was created in order to provide a voice for the patients in the process, and eliminating qualified PCOs due to compensation restraints runs contrary to the intent Congress had in implementing the program.") (citing Motion of R. Brent Martin, PCO, for Payment of Fees and Expenses, Haven Eldercare, Case No. 07-32720, Docket Nos. 707 and 1217 (Bankr. D. Conn.)); *see also* discussion infra Part V.

120   11 U.S.C.A. § 327(a) ("[T]he trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.").

121   11 U.S.C.A. § 327(a).

122   In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2 (Bankr. N.D. Tex. 2008).

123   See 11 U.S.C.A. § 330; In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2 (Bankr. N.D. Tex. 2008) ("Congress also amended section 330 of the Code to provide for compensating and reimbursing expenses of an ombudsman but made no provision in that section for compensation of an ombudsman's professionals, nor did Congress amend section 327 or provide elsewhere for the employment of professionals by a patient care ombudsman.").

124   In re Synergy Hematology-Oncology Medical Associates, Inc., 433 B.R. 316, 317, 52 Bankr. Ct. Dec. (CRR) 175, Bankr. L. Rep. (CCH) P 81697 (Bankr. C.D. Cal. 2010) ("The court finds that the bankruptcy code authorizes the appointment of legal counsel, *where appropriate*, for a patient care ombudsman.") (emphasis added); In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *2, *4 (Bankr. N.D. Tex. 2008) (although "retention by [a PCO] of professionals is not consistent with the central purpose of bankruptcy in general and chapter 11 in particular: improving return to creditors and equity owners," PCOs should be allowed to retain professionals "only upon a clear showing of need.").

125   Levinson et al., *supra*, at 16.

126    Levinson et al., *supra*, at 16 (citing Our Lady of Mercy Med., et al., Case No. 07-10609 (Bankr. S.D.N.Y.); Atl. Health Servs., Inc., Case No. 06-10356 (Bankr. D. Md.); Ill. Skin Inc., Case No. 06-16098 (Bankr. N.D. Ill.); In re Dari Ann Ungaretti, Case No. 06-16094 (Bankr. N.D. Ill.)).

127    Levinson et al., *supra*, at 16–17 (citing In re Haven Eldercare, LLC, 382 B.R. 180, 183, 49 Bankr. Ct. Dec. (CRR) 156 (Bankr. D. Conn. 2008); Johnson v. Parker Hughes Clinics, 2005 WL 102968 (D. Minn. 2005)).

128    Levinson et al., *supra*, at 16–17 (citing In re Haven Eldercare, LLC, 382 B.R. 180, 183, 49 Bankr. Ct. Dec. (CRR) 156 (Bankr. D. Conn. 2008); Johnson v. Parker Hughes Clinics, 2005 WL 102968 (D. Minn. 2005)).

129    *Haven Eldercare*, 382 B.R. at 183–84.
The Bankruptcy Code does not appear to provide for direct estate compensation for attorneys and/or others employed by an Ombudsman. Rather, the Code seems to contemplate that in the first instance the compensation of such entities should be the responsibility of an Ombudsman, who may then seek to have such expenses reimbursed under Section 330(a)(1)(B).
*Haven Eldercare*, 382 B.R. at 183–84.

130    *Haven Eldercare*, 382 B.R. at 183–84 ("However, even such indirect compensation is not provided for on an *interim* basis under the terms of Section 331.") (emphasis in original).

131    Fitzgerald, DeAngelis, Elliot and McDow, Jr., What's on OUST's Radar?, 073108 ABI-CLE 9, Am. Bankr. Inst. (July 31, 2008).

132    Fitzgerald, DeAngelis, Elliot and McDow, Jr., What's on OUST's Radar?, 073108 ABI-CLE 9, Am. Bankr. Inst. (July 31, 2008).

133    DeAngelis & Bridenhagen, *supra* note 66, at 46 (citing 3 Collier on Bankruptcy ¶333.05[1] (15th ed. Rev. 2006)).

134    In re Synergy Hematology-Oncology Medical Associates, Inc., 433 B.R. 316, 319, 52 Bankr. Ct. Dec. (CRR) 175, Bankr. L. Rep. (CCH) P 81697 (Bankr. C.D. Cal. 2010).

135    In re Renaissance Hospital-Grand Prairie, Inc., 2008 WL 5746904, *4 (Bankr. N.D. Tex. 2008) ("[I]t seems clear that Congress must have anticipated that an ombudsman would, on occasion, have to have the assistance of counsel."); In re Synergy Hematology-Oncology Medical Associates, Inc., 433 B.R. 316, 319, 52 Bankr. Ct. Dec. (CRR) 175, Bankr. L. Rep. (CCH) P 81697 (Bankr. C.D. Cal. 2010).

136    In re Positive Health Mgmt., Inc., Case No. 08-31630-H4-11 (Bankr. S.D. Tex. May 8, 2008) (Agreed Order Regarding Debtor's Requirement to Self Report to the Court in Lieu of the Appointment of a Patient Care Ombudsman.).

137    In re Bamberg Cnty. Mem'l Hosp., 2011 Bankr. LEXIS 3264, at *11 (Bankr. D.S.C. July, 19 2011).

---

**End of Document**       © 2017 Thomson Reuters. No claim to original U.S. Government Works.