## IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **REMARKABLE HEALTHCARE OF** | § | **Chapter 11** |
| **CARROLLTON, LP et al[1].,** | § | **Case No. 18-40295** |
| | § | **(Jointly Administered)** |
| Debtors. | § | |

**SECOND AMENDED DISCLOSURE STATEMENT UNDER 11 U.S.C. § 1125 IN SUPPORT OF DEBTORS' JOINT PLAN OF REORGANIZATION**

**Dated: March 29, 2019 (as updated April 5, 2019)**

---

THIS DISCLOSURE STATEMENT HAS <mark>**NOT YET**</mark> BEEN
APPROVED BY THE COURT FOR VOTING

---

THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTORS AND DESCRIBES THE TERMS AND PROVISIONS OF, AND SETS FORTH CERTAIN MATERIAL CONSIDERATIONS IN CONNECTION WITH, THE DEBTORS' PLAN OF REORGANIZATION (THE "PLAN"). ANY CAPITALIZED TERM USED IN THIS DISCLOSURE STATEMENT THAT IS NOT DEFINED HEREIN HAS THE MEANING ASCRIBED TO THAT TERM IN THE PLAN. THE DEBTORS URGE YOU TO ACCEPT THE PLAN BY SIGNING AND RETURNING THE BALLOTS MAILED TO YOU ALONG WITH THIS DISCLOSURE STATEMENT. IN THE EVENT THAT THE PLAN IS NOT CONFIRMED, THE DEBTORS MAY BE FORCED TO LIQUIDATE THEIR ASSETS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IN A CHAPTER 7 LIQUIDATION, THE DEBTORS BELIEVE THAT CREDITORS WOULD RECEIVE SUBSTANTIALLY LESS THAN IS CONTEMPLATED BY THE PLAN.

Mark A. Castillo
Texas State Bar No. 24027795
CURTIS | CASTILLO PC
Bank of America Plaza
901 Main Street, Suite 6515
Dallas, Texas  75202
Telephone:  214.752.2222
Facsimile:  214.752.0709
E-mail:  mcastillo@curtislaw.net

COUNSEL FOR DEBTORS-IN-POSSESSION

---

[1] The Debtors in these jointly-administered chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Remarkable Healthcare of Carrollton, LP (5960), Remarkable Healthcare of Dallas, LP (3418), Remarkable Healthcare of Fort Worth, LP (1650), Remarkable Healthcare of Seguin, LP (4566), and Remarkable Healthcare, LLC (5142).

**TABLE OF CONTENTS**

PLAN SUMMARY..................................................................................................................1

I. INTRODUCTION ............................................................................................................2

   A.  *Filing of the Debtors' Bankruptcy Cases* ...................................................................2
   B.  *Purpose of the Disclosure Statement*.........................................................................2
   C.  *Sources of Information* ...............................................................................................2

II. OVERVIEW OF CHAPTER 11 ....................................................................................3

   A.  *Overview of Chapter 11* .............................................................................................3
   B.  *Plan of Reorganization.*..............................................................................................3

III. VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION...........4

   A.  *Persons Entitled to Vote* .............................................................................................4
   B.  *Voting Instructions* .....................................................................................................5
      1.  Deadline for Submission of Ballots ...................................................................5
      2.  Incomplete or Irregular Ballots .........................................................................5
      3.  Ballot Retention.................................................................................................5
   C.  *Confirmation of Plan* ..................................................................................................5
      1.  Solicitation of Acceptances ...............................................................................5
      2.  Requirements for Confirmation of the Plan .......................................................6
      3.  Acceptances Necessary to Confirm the Plan .....................................................7
   4.  Cramdown ..............................................................................................................7
   5.  Absolute Priority Rule............................................................................................7

IV. BACKGROUND OF DEBTORS AND EVENTS LEADING TO BANKRUPTCY ........8

   A.  *History of The Debtors and Background of the Debtors' Management* ......................8
   B.  *Management's Discussion of the Events Leading to Bankruptcy*................................8
      1.  *Revenue*...........................................................................................................9
      2.  *Expenses* .........................................................................................................9
   C.  *Goal of the Debtors' Bankruptcy Cases* ....................................................................9
      1.  *Next Steps:* ......................................................................................................9
      2.  *Future Management of the Debtors:*.................................................................9

V. POST-PETITION OPERATIONS AND SIGNIFICANT ORDERS AND EVENTS.........9

   A.  *Post-Petition Operations*............................................................................................9
   B.  *Significant Orders and Events During the Debtors' Bankruptcy Cases*....................10
      1.  General Case Background ................................................................................10
      2.  Meeting of Creditors and Claims Bar Dates ....................................................10

VI. ASSETS AND LIABILITIES OF THE DEBTORS ...................................................12

   A.  *Overview of the Debtors' Assets* ..............................................................................12
   B.  *Overview of the Debtors' Liabilities* ........................................................................12
   C.  *Classification of Claims, Estimated Allowed Claims, and Estimated Recoveries*....12
   D.  *Estimated Professional Fees and Reorganization Costs* ..........................................15
   E.  *Estate Actions*..........................................................................................................16

VII. OVERVIEW OF THE PLAN.....................................................................................18

VIII. MEANS FOR EXECUTION OF THE PLAN...........................................................18

   A.  *Powers and Duties of the Reorganized Debtors with Respect to Consummation of the Plan*....18
   B.  *Vesting of Assets*......................................................................................................18
   C.  *Corporate Purpose of the Reorganized Debtor*........................................................19
   D.  *Assumption of Liabilities* ..........................................................................................19
   E.  *Contested Claims*......................................................................................................19
   F.  *Estimated Claims*......................................................................................................19

G. *Deficiency Claims* ........................................................................................19
H. *Conditions Precedent to Effective Date*............................................................19
I. *Waiver of Conditions*....................................................................................19
J. *Retention of Bankruptcy Court Jurisdiction*.......................................................20
K. *Miscellaneous Provisions of the Plan* ...............................................................20
  1. Setoff and Other Rights. ...........................................................................20
  2. Discharge. ..............................................................................................20
  3. **Injunctions**.............................................................................................20
  4. ***Injunction Regarding Claims Against the Debtors***.......................................20
  5. Lawsuits................................................................................................21
  6. *Binding Effect*.........................................................................................21
  7. Modification or Revocation of Plan. ..........................................................21
  8. Creditor Defaults ....................................................................................22
  9. Retention of Causes of Action ..................................................................22

**IX. FEASIBILITY AND RISKS** ...........................................................................**22**

A. *Management's Discussion of Financial Projections* ...............................................22
B. *Risks 23*
  1. Certain Risks of Non-Confirmation...........................................................23
  2. Potential Effects of a Prolonged Chapter 11 Proceeding.................................23
  3. Risks Relating to the Projections and Liquidation Analysis.............................23
  4. Capital Requirements................................................................................23
  5. Forward-Looking Information May Prove Inaccurate.....................................24
  6. Market and Economic Factors....................................................................24

**X. ALTERNATIVES TO PLAN** ...........................................................................**24**

A. *Liquidation Analysis*....................................................................................24
B. *Other Alternative Plans* ................................................................................26

**XI. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**26

A. *Federal Income Tax Consequences to the Debtors* .................................................26
  1. In General ..............................................................................................26
  2. Treatment of Debt Discharge Income Under the Plan....................................26
B. *Federal Income Tax Consequences to Creditors* ...................................................27
  1. In General ..............................................................................................27
  2. Payments Attributable to Interest...............................................................27
  3. Backup Withholding and Information Reporting ...........................................27
C. *Federal Income Tax Consequences to Interest Holders*............................................28

**XII. CONCLUSION**.............................................................................................**28**

## PLAN SUMMARY

On February 12, 2018 (the "Petition Date"), Remarkable Healthcare of Carrollton, LP, and its affiliated debtors and debtors-in-possession, Remarkable Healthcare of Dallas, LP, Remarkable Healthcare of Fort Worth, LP, Remarkable Healthcare of Seguin, LP, and Remarkable Healthcare, LLC, (collectively, the "Debtors") commenced reorganization cases by filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division (the "Court").

The Debtors have proposed a Joint Plan of Reorganization, as may be amended (the "Plan"), for the benefit of their creditors. The Plan represents the culmination of significant efforts by the Debtors to put forth a confirmable exit strategy to allow the Debtors to satisfy their debts and creditors.

**All holders of Claims or Interests are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, which is attached hereto as "Exhibit A". The Plan contains definitions that may not be defined directly herein but are essential to the interpretation of the Disclosure Statement and Plan.** Voting instructions regarding the Plan are provided (i) in this Disclosure Statement, (ii) in the Order approving the Disclosure Statement, and (iii) in the Ballots enclosed herewith. The Plan can only be confirmed if at least one voting Class of Claims votes in favor of the Plan.

**The Debtors and their current principal lender, Comerica Bank, have reached an agreement that will allow Comerica Bank to support the Debtors' Plan, provided the Plan conforms to the parties' written agreement.**

Generally, the Plan is a Chapter 11 plan that obtains new financing to pay off existing secured lenders and vests the assets of the Debtors' estates in the Reorganized Debtors to be administered by the Reorganized Debtors. As detailed below, the Debtors retained Griffin Financial Group, LLC to seek interest in new financing for the Debtors. The Debtors have recently executed a term sheet[2] with a new lender named Alleon Capital Partners, LLC d/b/a Alleon Healthcare Capital ("Alleon"). Alleon has expressed interest in providing new funding to the Debtors, subject to its own due diligence and other considerations. Alleon's loans will be secured with first-priority liens on substantially all of the Debtors' assets postconfirmation. The Debtors believe that, after the due diligence period,[3] Alleon will offer the Debtors new funding that will allow the Debtors to partially pay off existing secured lenders, fund certain of the Debtors' obligations under the Plan, and allow the Debtors to exit bankruptcy. The Reorganized Debtors then will begin to make distributions and payments required by the Plan, object to Claims against the Debtors' estates, and prosecute claims and Estate Actions against third parties as appropriate to obtain assets for purposes of the Plan distributions to creditors.

On the Effective Date, all real and personal property of the Debtors, including but not limited to all Estate Actions, shall vest in the Reorganized Debtors, and it is contemplated that no further reorganization or conversion need or shall occur. From and after the Effective Date, the Reorganized Debtors shall be authorized to operate, and shall be authorized to make the distributions required under, and implement the provisions of, the Plan.

> **The Debtors strongly believe that the Plan is in the best interests of all holders of Claims and that both secured and unsecured creditors would receive fewer or no distributions if the Plan is not approved.**

If the Plan is confirmed, the holders of Allowed Claims against the Debtors will be entitled to distributions and treatment as set forth in the Plan. However, if the Plan is *not* confirmed, after payment of the primary secured

---

[2] As may be appropriate or necessary, the term sheet may be filed or presented to the Court in connection with hearing on approval of the Disclosure Statement and confirmation of the Plan.

[3] The Debtors estimate the due diligence period will be finalized by mid-April 2019.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 1**

debt owned by Comerica Bank, the Debtors expect there will be no funds remaining for distribution to holders of Allowed Claims if the Plan is not confirmed and the Debtors are forced to liquidate, delay the distributions process, and possibly add additional administrative claims of professionals.

## I. INTRODUCTION

A.  *Filing of the Debtors' Bankruptcy Cases*

The Debtors' reorganization cases (the "Bankruptcy Case") are pending in the United States Bankruptcy Court for the Eastern District of Texas, Sherman Division, before the Honorable Brenda T. Rhoades, United States Bankruptcy Judge.  Since the respective Petition Dates, the Debtors have been Debtors-in-Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.  *Purpose of the Disclosure Statement*

This Disclosure Statement is submitted by the Debtors pursuant to section 1125 of the Bankruptcy Code in connection with the Debtor's Plan.  A copy of the Plan is attached to this Disclosure Statement as **Exhibit A**.  For purposes hereof, any term used in this Disclosure Statement (regardless of capitalization) and not otherwise separately defined herein shall have the defined meaning ascribed to it in the Plan or, if not defined in the Plan, then in section 101 of the Bankruptcy Code.

**IT IS OF UTMOST IMPORTANCE THAT YOU READ THIS DISCLOSURE STATEMENT IN FULL AND IN CONJUNCTION WITH THE PLAN ATTACHED HERETO.**

**OTHER THAN THIS DISCLOSURE STATEMENT, NO STATEMENT OR INFORMATION GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OR REJECTIONS OF THE PLAN HAS BEEN APPROVED BY THE BANKRUPTCY COURT CONCERNING (1) THE DEBTORS AND DEBTORS' BUSINESS, ASSETS OR PROPERTY; (2) THE REORGANIZED DEBTORS AND THE PROJECTED RESULTS OF DEBTORS' FUTURE BUSINESS OPERATIONS AND FINANCIAL CONDITION; OR (3) DISTRIBUTIONS TO BE MADE UNDER THE PLAN.  YOU SHOULD USE CAUTION IN CONSIDERING ANY STATEMENT OR INFORMATION IN MAKING YOUR VOTING DECISION BASED UPON INFORMATION NOT CONTAINED HEREIN.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.  THIS DISCLOSURE STATEMENT CONTAINS PROJECTED FINANCIAL INFORMATION REGARDING THE DEBTORS AND THE REORGANIZED DEBTORS AND CERTAIN OTHER FORWARD-LOOKING STATEMENTS, ALL OF WHICH ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND MAY NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE RISKS INCLUDING, AMONG OTHERS, THOSE DESCRIBED HEREIN. *SEE* "ARTICLE IX – FEASIBILITY AND RISKS." CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS, AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.**

C.  *Sources of Information*

**THE STATEMENTS AND THE FINANCIAL INFORMATION ABOUT THE DEBTORS AND/OR THE REORGANIZED DEBTORS INCLUDING ALL FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS AND INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM THE DEBTORS' BOOKS AND RECORDS.  WHILE THE DEBTORS BELIEVE THE INFORMATION TO BE ACCURATE AND COMPLETE, THE DEBTORS AND DEBTORS' PROFESSIONALS HAVE NOT TAKEN ANY INDEPENDENT ACTION TO VERIFY THE ACCURACY OR COMPLETENESS OF SUCH**

STATEMENTS AND INFORMATION AND EXPRESSLY DISCLAIM ANY REPRESENTATION CONCERNING THE ACCURACY OR COMPLETENESS THEREOF.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED, AND DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT OR SINCE THE MATERIALS RELIED UPON IN THE PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.

Certain of the materials contained in this Disclosure Statement are taken directly from other readily accessible documents or are summaries of other documents. While the Debtors have made every effort to retain the meaning of such other documents or portions that have been summarized, the Debtors urge that any reliance on the contents of such other documents should depend on a thorough review of the documents themselves. In the event of a discrepancy between this Disclosure Statement and the actual terms of a document, the actual terms of such document shall apply and govern.

No statements concerning the Debtors, the value of Debtors' property, or the value of any benefit offered to the holder of a Claim or Interest in connection with the Plan should be relied upon other than as set forth in this Disclosure Statement. In arriving at your decision, you should not rely on any representation or inducement made to secure your acceptance or rejection that is contrary to information contained in this Disclosure Statement, and any such additional representations or inducements should be reported to counsel for the Debtor:

Mark A. Castillo
CURTIS | CASTILLO PC
Bank of America Plaza
901 Main Street, Suite 6515
Dallas, Texas 75202
Telephone: 214.752.2222
Facsimile: 214.752.0709
E-mail: mcastillo@curtislaw.net

## II. OVERVIEW OF CHAPTER 11

A.  *Overview of Chapter 11*

Chapter 11 is the principal reorganization Chapter of the Bankruptcy Code. Upon the commencement of a Chapter 11 case, section 362 of the Bankruptcy Code provides for an automatic stay of all attempts to collect upon claims against a debtor that arose prior to the bankruptcy filing. Generally speaking, the automatic stay prohibits interference with a debtor's property or business.

Under Chapter 11, a debtor attempts to reorganize its business and/or debts for the benefit of the debtor and its creditors. Confirmation of a plan of reorganization is a primary purpose of a reorganization case under Chapter 11 of the Bankruptcy Code.

B.  *Plan of Reorganization*

A plan of reorganization sets forth the means for satisfying all claims against, and interests in, a debtor. Generally, a claim against a debtor arises from a normal debtor/creditor transaction such as a promissory note or a trade-credit relationship, but may also arise from other contractual arrangements or from alleged torts. An interest in the debtor is held by a party that owns all or part of the debtor, such as a shareholder or partner.

After a plan of reorganization has been filed with a bankruptcy court, it must be voted on by holders of

impaired claims against, or interests in, the debtor.  Section 1125 of the Bankruptcy Code requires that a plan proponent fully disclose sufficient information about the debtor, its assets, and the plan of reorganization to claim holders and interest holders before acceptances of that plan may be solicited.  This Disclosure Statement is being provided to the holders of Claims against, or Interests in, the Debtor to satisfy such requirements of section 1125 of the Bankruptcy Code.

The Bankruptcy Code provides that claim holders and interest holders are to be grouped into "classes" under a plan and that they are to vote to accept or reject a plan by class.  While case law has varied on the proper method to be used in classifying claim holders and interest holders, the Bankruptcy Code requires that holders of claims with dissimilar legal rights shall not be placed together in the same class.  Generally, each secured creditor will be placed in a class by itself because each such creditor usually has a Lien on distinct property and therefore has distinct legal rights.

To confirm the Plan the Court must determine that the requirements of section 1129(a) of the Bankruptcy Code have been satisfied.  See below, "Voting Procedures and Requirements for Confirmation," Article III, for a discussion of the section 1129(a) requirements for confirmation of a plan of reorganization.

THE DEBTORS BELIEVE THAT THE PLAN SATISFIES EACH OF THE CONFIRMATION REQUIREMENTS OF SECTION 1129(a) AND, IF NECESSARY, SECTION 1129(b) OF THE BANKRUPTCY CODE.

Confirmation of the Plan makes the Plan binding upon the Debtors, the Reorganized Debtors, Claim holders, Interest holders, and other parties in interest irrespective of whether they have filed proofs of Claim or voted to accept the Plan.

### III.  VOTING PROCEDURES AND REQUIREMENTS FOR CONFIRMATION

If you are the holder of a Claim or Interest in one of the Classes whose rights are affected by the Plan, it is important that you vote.  If you fail to vote, your rights may be jeopardized.

A.  *Persons Entitled to Vote*

Pursuant to the provisions of section 1126 of the Bankruptcy Code, only holders of Claims or Interests that are (i) Allowed, (ii) impaired, and (iii) receiving or retaining property on account of such Claims pursuant to the Plan, are entitled to vote either for or against the Plan ("Voting Claims").  Accordingly, in the Bankruptcy Case, all Classes of Claims that are impaired under the Plan should have received a Ballot for voting (with return envelope) along with this Disclosure Statement, Plan, and other materials because these are the only Classes consisting of impaired Claims that are receiving property.  Under the Bankruptcy Code, Classes that are unimpaired are presumed to vote to accept the Plan and, therefore, votes from such Classes are not solicited.  Classes that do not receive or retain any property under the Plan as payment of the Interests within such Class are presumed to vote to reject the Plan and, therefore, votes from such Classes are not solicited.

As referenced in the preceding paragraph, a Claim must be Allowed to be a Voting Claim.  The Debtors filed the Schedules in the Bankruptcy Case listing Claims against the Debtors.  To the extent a creditor's Claim was listed in the Debtors' Schedules, and was not listed as disputed, contingent, or unliquidated, such Claim is deemed "Allowed."  Any creditor whose Claim was not scheduled, or was listed as disputed, contingent, or unliquidated, must timely file a proof of Claim in the Bankruptcy Case in order to have an Allowed Claim against the Debtors.

The last day for holders of Claims to file their Claims for amounts owed or Interests held prepetition against the Debtors was June 12, 2018 ("Claims Bar Date").  Claims not filed by the Claims Bar Date will be forever barred and discharged.

Absent an objection to a timely filed proof of Claim by the Objection Deadline, such Claim is deemed Allowed.  In the event that any proof of Claim is a Contested Claim during the Plan voting period, then, by definition,

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 4**

it is not Allowed for purposes of section 1126 of the Bankruptcy Code, and is not to be considered a Voting Claim entitled to cast a Ballot. Nevertheless, pursuant to Bankruptcy Rule 3018(a), the holder of a Contested Claim may petition the Bankruptcy Court, after notice and hearing, to allow the Claim temporarily for voting purposes in an amount that the Bankruptcy Court deems proper. Allowance of a Claim for voting purposes, and disallowance for voting purposes, does not necessarily mean that all or a portion of the Claim will be Allowed or Disallowed for distribution purposes.

BY ENCLOSING A BALLOT, THE DEBTORS ARE NOT REPRESENTING THAT YOU ARE ENTITLED TO VOTE ON THE PLAN. BY INCLUDING A CLAIM AMOUNT ON THE BALLOT (IF APPLICABLE), THE DEBTORS ARE NEITHER ACKNOWLEDGING THAT YOU HAVE AN ALLOWED CLAIM IN THAT AMOUNT NOR WAIVING ANY RIGHTS THE DEBTORS MAY HAVE TO OBJECT TO YOUR VOTE OR CLAIM.

If you believe you are a holder of a Claim in an impaired Class under the Plan and entitled to vote to accept or reject the Plan, but did not receive a Ballot with these materials, please contact Mark A. Castillo, Curtis | Castillo PC, Bank of America Plaza, 901 Main Street, Suite 6515, Dallas, Texas 75202, Telephone: 214.752.2222, E-mail: mcastillo@curtislaw.net.

B. *Voting Instructions*

If you are a holder of a Voting Claim, your vote on the Plan is important. Please read the voting instructions carefully and return your Ballots as specified below and on the Voting Instructions contained in and attached to your Ballots.

1. Deadline for Submission of Ballots

BALLOTS MUST BE ACTUALLY RECEIVED BY THE DEBTORS' COUNSEL, WHETHER BY MAIL, COURIER, OR FACSIMILE, ON OR BEFORE May 10, 2019 AT 4:00 P.M. CENTRAL TIME. ANY BALLOTS RECEIVED AFTER THAT TIME WILL NOT BE COUNTED. ANY BALLOT THAT IS NOT EXECUTED BY A PERSON AUTHORIZED TO SIGN SUCH BALLOT WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS REGARDING THE PROCEDURES FOR VOTING ON THE PLAN OR YOU DID NOT RECEIVE OR NEED A REPLACEMENT BALLOT, CONTACT MARK A CASTILLO, CURTIS | CASTILLO PC, 901 MAIN STREET, SUITE 6515, DALLAS, TEXAS 75202, (TELEPHONE: 214.752.2222, E-MAIL: MCASTILLO@CURTISLAW.NET. **THE DEBTORS URGE ALL HOLDERS OF VOTING CLAIMS TO VOTE IN FAVOR OF THE PLAN.**

2. Incomplete or Irregular Ballots

Ballots that fail to designate the Class to which they apply will be counted, subject only to contrary determinations by the Court, in the Class determined by the Debtors. Subject to the Court's ultimate approval, the Debtors' counsel will use its best judgment in the determination of votes; however, Ballots that do not reflect acceptance or rejection, or reflect both acceptance and rejection of the Plan for a single Claim will not be counted. All votes shall be subject to final determination of the Bankruptcy Court.

3. Ballot Retention

Original ballots will be retained by the Debtors' counsel for six (6) months following the Confirmation Date, after which they may be destroyed at the discretion of the Debtors' counsel.

C. *Confirmation of Plan*

1. Solicitation of Acceptances

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                                      **Page 5**

The Debtors are soliciting your vote. The cost of any solicitation by the Debtors will be borne by the Debtors. No other additional compensation shall be received by any party for any solicitation other than as disclosed to the Bankruptcy Court.

NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE THAT ARE OTHER THAN HEREIN CONTAINED SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

THIS IS A SOLICITATION SOLELY BY THE DEBTORS AND IS NOT A SOLICITATION BY ANY INTEREST HOLDER, ATTORNEY, FINANCIAL ADVISOR, OR ACCOUNTANT FOR THE DEBTORS. THE REPRESENTATIONS, IF ANY, MADE HEREIN ARE THOSE OF THE DEBTORS AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, FINANCIAL ADVISORS, OR ACCOUNTANTS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.

Under the Bankruptcy Code, a vote for acceptance or rejection of the Plan may not be solicited unless the Claim holder has received a copy of a disclosure statement approved by the Bankruptcy Court prior to, or concurrently with, such solicitation. This solicitation of votes on the Plan is governed by section 1125(b) of the Bankruptcy Code. Violation of section 1125(b) of the Bankruptcy Code may result in sanctions by the Bankruptcy Court, including disallowances of any improperly solicited vote.

2.    Requirements for Confirmation of the Plan

At the Confirmation Hearing, the Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied. If those requirements have been satisfied, the Court will enter the Confirmation Order. The requirements for confirmation under the Bankruptcy Code, to the extent they may be applicable to these Debtors, are as follows:

- The Plan complies with the applicable provisions of the Bankruptcy Code.
- The proponent of the Plan has complied with the applicable provisions of the Bankruptcy Code.
- The Plan has been proposed in good faith and not by any means forbidden by law.
- Any payment made or promised by the proponent of the Plan or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the Plan and incident to the Bankruptcy Case, was disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.
- The proponent of the Plan has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as director, officer or voting trustee of the Debtors, any affiliate of the Debtors participating in a plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or the continuance in, such office of such individual, is consistent with the interests of holders of Claims and with public policy.
- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of the compensation for such Insider.
- Any governmental regulatory commission with jurisdiction, after confirmation of the Plan, over the rates of the Debtors have approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval.
- With respect to each Class of impaired Claims, either each holder of a Claim in such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim property of a value, as of the Effective Date of the Plan, that is not less than the amount such Claim holder would receive or retain if the Debtors were liquidated on such date under Chapter 7 of the Bankruptcy

Code.

- Subject to the Plan proponent's "cramdown" right described in Article III.C.4., which follows, each Class of Claims has either accepted the Plan or is not impaired under the Plan.
- Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Claims will be paid in Cash in full on the Effective Date and that any tax Claim entitled to priority under section 507(a)(8), the holder of such Claim will receive on account of such Claim regular installment payments, (i) of a total value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim; (ii) over a period ending not later than 5 years after the date of the order for relief; and (iii) in a manner not less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.
- At least one impaired Class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in such Class.
- Confirmation of the Plan is not likely to be followed by the liquidation of the Debtors or the need for further financial reorganization of the Debtors or any successors to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.
- All fees payable under 28 U.S.C. § 1930 have been paid (or the Plan has provided for payment of such fees) on the Effective Date of the Plan.
- The Plan provides for continuation after its Effective Date of retiree benefits, if any, for the duration of the period the Debtors are obligated to provide such benefits.
- All transfers of property under the Plan are in accordance with any applicable provisions of non-bankruptcy law that governs transfer of property by a non-commercial corporation or trust.

The Debtors believe that the confirmation requirements applicable to the Bankruptcy Case are met under the Plan. The Debtors will present evidence in support of each applicable requirement at the Confirmation Hearing.

3. Acceptances Necessary to Confirm the Plan

The Bankruptcy Code does not require that each holder of a Claim or Interest vote in favor of the Plan for the Court to confirm the Plan. Rather, the Plan must be accepted by each *Class* of holders of Claims or Interests (subject to an exception discussed below and in Article III.C.4.). Under the Bankruptcy Code, a Class of holders of Claims or Interests has accepted the Plan if, of the Claims in the Class that actually voted on the Plan, such Claims constituting at least two-thirds in dollar amount and more than one-half in number of voted Allowed Claims vote to accept the Plan, excluding the votes of Insiders. For example, if a hypothetical class has ten claims that are voted and the total dollar amount of those ten claims is $1,000,000, then for such class to have accepted the plan, six or more of those claims must be voted to accept the plan (a simple majority), and the claims voted to accept the plan must total at least $666,667 (a two-thirds majority).

4. Cramdown

If any impaired Class of Claims does not vote to accept the Plan, the Court may nevertheless confirm the Plan pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. If the Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" to each Class of dissenting holders of Claims or Interests, the Court may confirm the Plan through "cramdown." The Plan will not discriminate unfairly if no Class receives more than it is legally entitled to receive.

With respect to each dissenting Class of unsecured Claims, "fair and equitable" means either: (i) the members of each dissenting impaired Class of unsecured Claims receive property of a value, as of the Effective Date of the Plan, equal to the amount of their Allowed Claim; or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of unsecured Claims will not receive any property under the Plan. The Plan would not be fair and equitable to a Class of holders of Interests if any junior Class of holders of Claims is paid more than in full.

5. Absolute Priority Rule

Simply characterized, the absolute priority rule set forth in section 1129(b)(2)(B) of the Bankruptcy Code

requires that confirmation obtained by "cramdown" meet an "either/or" test. Either (i) the members of each dissenting impaired Class of unsecured Claims must be paid in full, or (ii) the holders of Claims and Interests that are junior to each dissenting impaired Class of Claims must not receive any property under the plan of reorganization on account of "such junior interest." The absolute priority rule applies only in a case where a Class of Claims or equity Interests is impaired and does not accept the Plan. Thus, the absolute priority rule does not apply to all Classes of Claims and equity Interests but only to the dissenting Class and Classes junior to the dissenting Class.

A more comprehensive discussion of the application of the absolute priority rule and the new value exception contains complexities and subtleties, the explanation of which is beyond the scope of this Disclosure Statement. To the extent a Claim holder or Interest holder desires further explanation regarding such rule or its exception, they are advised to seek advice of counsel.

### IV. BACKGROUND OF DEBTORS AND EVENTS LEADING TO BANKRUPTCY

A. *History of The Debtors and Background of the Debtors' Management*

Each of the Debtors, with the exception of the Debtors' management company, Remarkable Healthcare, LLC, is a limited partnership organized under the laws of the State of Texas. The sole general partner of these Debtors is LBJM, LLC, a Texas limited liability company, whose president and sole owner is Laurie Beth McPike. The Debtors' President and Chief Executive Officer is Laurie Beth McPike and their Chief Operating Officer is Jon McPike.

The Debtors, which were formed in Texas from 2010 to 2013, operate several skilled nursing facilities with hundreds of resident patients and employees located in Carrollton, Dallas, Fort Worth, and Seguin. The Debtors' business is focused on the individual who needs healthcare services after his or her hospital stay, and provides services both to help individuals return home to the community, as well as long term services for those individuals who require extended care. Services are tailored to each individual, with the goal of facilitating increased strength and flexibility while minimizing pain and impairment. Stabilizing the patient from a clinical, nursing, and social aspect is the Debtors' top priority.

B. *Management's Discussion of the Events Leading to Bankruptcy*

In the Spring and Summer of 2016, Remarkable Healthcare's management noticed a change in the way the Department of Health and Human Services was managing complex Medicaid Pending cases. Remarkable Healthcare found itself with over 150 clients having Medicaid Pending and Annual Renewals denied at an alarming rate. These cases translated into over $2 Million in uncollected cash for care already provided.

In the Fall of 2016, Remarkable Healthcare's CEO and COO began a series of meetings with the Texas Medicaid Commissioners and Commissioners at the Department of Family and Children Protective Services. During these meetings, RH communicated several systemic issues with HHSC processes that were not being captured within HHSC's quality control metrics that were having catastrophic effects on elderly Texans in need of healthcare. Remarkable Leadership also met with several state senators. Through these meetings, over half the cases were reviewed in Austin leading to the eventual collection of over $1.2 million of the $2 million outstanding.

Remarkable Healthcare originally had a $3 million line of credit with its original lender, Comerica, and this loan was capped out. With half the cases still un-reviewed, Remarkable Healthcare's leadership solicited Montgomery Capital Partners for a bridge loan until further Medicaid Pending dollars could be collected. A bridge loan of over $600,000 was obtained and collateralized by the aged Medicaid Pending Accounts Receivable. Remarkable Healthcare leadership continued to meet with and negotiate with its original lender, Comerica, during this time, but the parties were unable to reach a long-term resolve.

Shortly after closing on the bridge loan, Remarkable Healthcare of Seguin was randomly chosen for a Medicare Prepaid Audit of 100% of Medicare claims two months in a row. These audits placed a hold on Medicare dollars being released to the facility until claims were proven. This process took over 120 days and held up over 60% of the facility's cash each month. Ultimately, 100% of the claims were accepted and reimbursed, although payments

were delayed over 120 days. This negated the impact of the bridge loan obtained from Montgomery Capital.

Remarkable Healthcare's management began speaking with banks, private equity firms, and other lenders and investors to replace Comerica's Line of Credit. After meeting with a new accounting firm, it was determined that a non-cash item (deferred rent) on the Debtors' balance sheet was a deterrent. Under certain accounting methods, the deferred rent shows as a liability causing the balance sheet to appear unfavorable.

During these periods, Remarkable Healthcare became involved in lawsuits with claims against a long-time pharmacy vendor for fraudulent inducement, and against a second pharmacy vendor for breach of contract. The lawsuits required cash outlays to Remarkable Healthcare's former professionals in excess of $250,000.

The combination of these various events encouraged the Debtors to restructure their liabilities under a Chapter 11 reorganization.

     1.   Revenue

Historically, the Debtors have maintained gross revenues aggregating approximately $2,350,000 per month. Postpetition revenues have been trending upward in comparison with revenues over the same period in 2017.

     2.   Expenses

Historically, the Debtors' expenses have matched their gross revenues of approximately $2,300,000 per month. Postpetition, however, expenses have been reduced significantly compared to 2017 as the Debtors have become more efficient in their operations.

    C.   *Goal of the Debtors' Bankruptcy Cases*

The Debtors' Bankruptcy Cases are intended to provide a financial breathing spell for the Debtors and to provide a forum for the orderly and efficient reorganization of the Debtors and the restructuring and satisfaction of the Debtors' outstanding obligations. The proposed Plan is the Debtors' best prospect for a prompt, objective, and streamlined approach to refinancing and paying creditors.

     1.   Next Steps:

The Debtors have implemented cost-cutting measures and efficiency in their business to stabilize the business, reduce losses, and increase growth. Already, the Debtors have experienced several months of year-versus-year increased income, while also making monthly interest payments to their principal lender. The Debtors will continue to maintain the cost-savings to ensure future financial stability.

     2.   Future Management of the Debtors:

The Plan contemplates that current management will remain in place with current annual salaries and duties, including Laurie Beth McPike, President/Chief Executive Officer at $260,000, Jon E. McPike, Chief Operating Officer at $175,000, and Jessica Anderson, Chief Clinical Officer at $145,000.

## V.  POST-PETITION OPERATIONS AND SIGNIFICANT ORDERS AND EVENTS

    A.   *Post-Petition Operations*

The Debtors have filed schedules of assets and liabilities and statements of financial affairs with the Court (collectively, including all amendments and supplements thereto, the "Schedules"). The Schedules contain a detailed description of the Debtors' assets, liabilities, and other information related to its business activities. Copies of the Debtors' Schedules and other filings may be obtained online from the Court's website at: https://ecf.txeb.uscourts.gov/. For information or to subscribe to PACER (the online court-document-viewing

system), you may visit the PACER Service Center website at http://pacer.psc.uscourts.gov or call (800) 676-6856. Due to the payment of certain creditors, certain court-approved agreements, and the discovery and/or investigation of other assets and liabilities, the Debtors' Schedules may be subsequently amended from time to time to reflect such information; however, any failure to amend shall not result in a claimant's Claim receiving a distribution for amounts already satisfied, released, or assigned.

Also, in conformance with the Guidelines of the Office of the United States Trustee for the Eastern District of Texas, the Debtors have filed and will continue to file the required monthly operating reports ("MORs") and pay the quarterly United States Trustee fees. The monthly operating reports are prepared by the Debtors' in-house professionals and detail the Debtors' post-petition operating activities, income, and disbursements. Copies of the Debtors' monthly operating reports also may be obtained online from the Court's website at: https://ecf.txeb.uscourts.gov. The Debtors' Monthly Operating Reports reflect the Debtors' increasing profitability when compared to 2017.

    B.   *Significant Orders and Events During the Debtors' Bankruptcy Cases*

    1.   General Case Background

The Debtors' voluntary Chapter 11 cases were filed on February 12, 2018. Thereafter, the Debtors acted as Chapter 11 Debtors-in-Possession. The Debtors filed a motion to retain Mark A. Castillo and Curtis | Castillo, PC as counsel for the Debtors, which was approved by the Court.

    2.   Meeting of Creditors and Claims Bar Dates

The United States Trustee's meeting of creditors under section 341(a) of the Bankruptcy Code was held on March 16, 2018. The Claims Bar Date for filing Claims against and Interest in the Debtors was June 12, 2018. The Debtors are analyzing Claims and they or the Reorganized Debtors may file objections to one or more of such Claims and Interests. Claims and Interests not filed by the Claims Bar Date are forever barred and discharged.

    3.   Cash Collateral

Throughout their reorganization efforts, the Debtors have maintained operations and obtained the Court's approval of the use of cash collateral. The various orders entered by the Court ensured that the Debtors could continue operations while also ensuring their lenders were provided adequate protection in the form of a monthly interest payment, replacement liens, and regular reporting.

    4.   Retention of Financial Professionals

In order to pursue refinancing and restructuring options, the Debtors retained Griffin Financial Group, LLC to seek interest in new financing for the Debtors. As a result of the Debtors' retention of Griffin Financial Group, the Debtors have recently executed a term sheet with a new lender, Alleon. Alleon has expressed interest in providing new funding to the Debtors, subject to its own due diligence and other considerations. Alleon's loans will be secured with first-priority liens on substantially all of the Debtors' assets postconfirmation. The Debtors believe that, after the due diligence period, the lender will offer the Debtors new funding that will allow the Debtors to partially pay off existing secured lenders, fund certain of the Debtors' obligations under the Plan, and allow the Debtors to exit bankruptcy.

    C.   *Sale of Debtors' Equity Interests*

**<u>NOTICE OF REPURCHASE OF DEBTORS' EQUITY INTERESTS</u>**

The Disclosure Statement and Plan constitute a motion to sell the Debtors' Equity Interests under the following terms. The Debtors' current equity owners are making new contributions in money that is reasonably equivalent to the value of the new equity interests in the Reorganized Debtors and is necessary for implementation of

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**        **Page 10**

a feasible reorganization plan. The Equity Interest Purchase Price will be utilized by the Debtors to fund their Plan. The Equity Interest Purchasers consist of the current individuals and partners of the Debtors identified in the Schedules and Statements, namely, Laurie Beth McPike, Remarkable Partners of Carrollton, LP, Remarkable Partners of Dallas, LP, Remarkable Partners of Fort Worth, LP, Remarkable Partners, LP [Seguin], and LBJM, LLC, or such other persons announced prior to the Confirmation Date, who shall pay the Equity Interest Purchase Price of $10,000 Cash, by the Effective Date, to purchase 100% of the new equity in the Reorganized Debtors.  Any person interested in making a higher and better offer exceeding the Equity Interest Purchase Price by an amount not less than $5,000.00 to purchase the new shares of equity to be issued in the Reorganized Debtors as set forth herein should immediately contact counsel for the Debtors in writing (email is acceptable) no later than 5:00 p.m. Central Prevailing Time on April 30, 2019 (the "Equity Bid Date").  Such interested person shall also provide the Debtors' counsel by no later than the Equity Bid Date with (a) a written offer, (b) a Cash deposit by cashier's check or wire transfer of such higher and better offer to fund such purchase, and (c) a binding commitment (which may be by a third party) to provide funding for the Debtors' Plan by May 15, 2019 in at least the amount proposed by the Debtors via their new lender Alleon (advancing approximately $3.5 million).  In the event that any qualifying written offers, Cash deposits, and funding commitments are received by the above deadline, the Debtors by emergency or expedited motion may seek an order of the Court to establish procedures for conducting an auction of the new shares of equity in the proposed Reorganized Debtors at or prior to confirmation, including earnest money requirements and minimum bid increments. To ensure Plan viability, no Holders of such Equity Interests in the post-confirmation Debtors shall receive any Cash distribution or Cash dividend whatsoever on account of such Interests for a period of twelve (12) months from the Effective Date of the Plan. The Equity Interest Purchasers shall be deemed to have full notice of the Plan payment obligations to the Debtors' Creditors and the Debtors' duties under the Plan.

Equity pricing and marketing:  The Debtors believe the proposed Equity Interest Purchase Price is reasonable and acceptable for several reasons, including (a) the reorganization cases have been on file for fourteen months and Debtors have not received any interest in equity acquisition, (b) plan exclusivity has expired for several months and Debtors have not received any equity proposals, (c) the Plan requires a substantial infusion of new loans with funds to be advanced at approximately $3.5 million, (d) new equity must ensure the Debtors comply with the Plan to make all cure payments and future payments on the Debtors' restructured debts, and (e) the Plan requires no equity distributions be made for at least one year after confirmation.  The Debtors are giving notice of the Equity Interest Purchase Price to their hundreds of lenders and creditors in these five Reorganization Cases, and do not believe it reasonable to expend financial resources performing any additional marketing or valuation on post-confirmation equity.

D.  *Notice of Agreement Between Debtors and Comerica Bank*

The Debtors and Comerica Bank ("Comerica") have reached an agreement on treatment of Comerica's claim of $4,967,862.48 as of March 28, 2019 ("Claim").  The terms of this agreement are summarized herein but not in an exhaustive manner.

Under the Plan, the Debtors must pay Comerica $2.4 million (the "Settlement Amount") in full in cash on or before May 31, 2019 pursuant to a confirmed Plan.  Confirmation of the Debtors' Plan must occur by entry of an order of the Bankruptcy Court on or before May 15, 2019. The terms of the Plan and confirmation order must be acceptable to Comerica in all respects.  The Settlement Amount (and any other amounts paid under the Plan to which Comerica is entitled) will be applied against Comerica's Claim on a dollar for dollar basis as Comerica deems appropriate in accordance with the terms of the Pre-Petition Facility Documents as defined in the Final Order Authorizing the Debtors to Use Cash Collateral and Providing for Adequate Protection entered by the Bankruptcy Court on April 20, 2018 and all other documents related thereto (collectively, "Loan Documents"). Comerica will release its liens upon timely receipt of the Settlement Amount, but the remaining balance owed to Comerica will not be waived, released or deemed satisfied under the Plan, but subject to strict compliance with  the terms and conditions outlined herein, Comerica will not seek to recover payment on the unpaid balance owed under the Loan Documents by the Debtors through the Plan and will vote in favor of the Plan.

The McPikes have agreed that they remain fully liable under their guarantee agreements in favor of Comerica for the entire remaining balance owed under the Loan Documents after the Settlement Amount (and any other amounts

paid under the Plan to which Comerica is entitled) is received and applied to Comerica's Claim, and they agree they shall not assert any claims, rights or defenses that contend otherwise, any such claims, rights or defenses having been waived and released.

In addition, the McPikes have agreed to fully cooperate and assist Comerica in its efforts to foreclose on and collect its collateral under the Loan Documents evidencing the Debtors' obligations to Comerica in the event the Debtors' Plan is not confirmed by May 15, 2019 and/or the Settlement Amount is not timely paid. If the Debtors and/or the McPikes breach their agreement, Comerica reserves all rights with respect to the Claim, the Plan, the Loan Documents and the McPikes' guarantees of the Claim. The McPikes acknowledge that in the event of such breach, Comerica may, in addition to all other rights and remedies, immediately proceed to commence suit against the McPikes under their guarantees to Comerica.

The Debtors and the McPikes believe the Settlement Amount reflects a good faith, arms-length settlement negotiated with the Debtors and the McPikes, on one hand, and Comerica on the other hand, is a valuable accommodation to both the Debtors and the McPikes, as guarantors of the Comerica debt under the Loan Documents, and the Settlement Amount is not an agreement or determination of the actual value of Comerica's collateral. Comerica has reserved and preserved all rights under the Loan Documents except as otherwise specifically provided in the parties' agreement. The Debtors and the McPikes acknowledge and agree that Comerica may take whatever steps it deems reasonable and necessary to preserve and protect its Claim in accordance with the Loan Documents in the event the Plan is not confirmed as required and/or the Settlement Amount is not timely paid.

E.  *Exit Financing*

To the extent necessary for Court approval under the Bankruptcy Code, the Disclosure Statement and Plan constitute a motion to approve a secured postpetition loan from Alleon under terms substantially in compliance with the terms outlined in the Alleon Term Sheet attached to this Disclosure Statement as Exhibit D.

## VI.  ASSETS AND LIABILITIES OF THE DEBTORS

A.  *Overview of the Debtors' Assets*

The Debtors operate several skilled nursing facilities, where hundreds of patient-residents reside. Since the Debtors' formation, they have operated Remarkable Healthcare facilities in Carrollton, Dallas, Fort Worth, and Seguin. Because the Debtors operate through leases, they do not own the buildings or real estate upon which they operate.

The Debtors' assets consist largely of accounts receivable (AR) and cash in the total amount of approximately $10,000,000. Due to the age and type of the Debtors' AR, not all of it may be collectible. The Debtors also scheduled approximately $150,000 in office FFE and perishable inventory and listed other assets.

B.  *Overview of the Debtors' Liabilities*

The Claims scheduled by the Debtors exceed $7 million in the aggregate as of the Petition Date. The Court's register for Claims filed against the Debtors is available on the Court's website at:  https://ecf.txeb.uscourts.gov.  The Court's Claim register may contain some Claims that have been paid, resolved in lower amounts, are duplicative, or are disputed by the Debtors.

C.  *Classification of Claims, Estimated Allowed Claims, and Estimated Recoveries*

Section 1122 of the Bankruptcy Code mandates that a claim or interest must be in its own class unless it is substantially similar to the claims or interests of another class. Debtors have, therefore, designated Classes for each Debtor in order to comply with Section 1122. Secured Classes are designated separately because each creditor's liens cover specific collateral and has different priorities. Other Classes may be designated separately due to their respective priority over other unsecured claims as that priority is established by the Bankruptcy Code. Finally, the equity interests

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                    **Page 12**

that comprise the final Class are legally different than the claims comprising each of the other Classes.

The Debtors reserve all rights to object to any and all Claims, Liens, and Interests filed or asserted against the Debtors or Debtors' property or property interests notwithstanding any discussion or treatment herein or in the Plan. The Debtors estimate that the aggregate Allowed Claims against the Debtors' estates will be as follows:

| Class of Claims | Classification of Claims against Remarkable Healthcare of Carrollton, LP | Est. No. of Claims | Estimated Allowed Amt. of Claims[4] | Estimated Recovery of Classes[5] |
|---|---|---|---|---|
| N/A | Administrative Claims (other than ordinary course) (÷5) | 8 | $239,650 | 95% (partially paid) |
| N/A | Priority Tax Claims | 2 | $681 | 100% |
| Class 1 | Secured Tax Claims of Denton County | 1 | $0 | -- |
| Class 2 | Secured Non-Tax Claims – Comerica Bank (÷5) | 3 | $993,573 | 48% |
| Class 3 | Secured Non-Tax Claims – Montgomery Capital Partners I, LP (÷5) | 2 | $99,117 | 46% (over 5 years) |
| Class 4 | Secured Non-Tax Claims – IPFS Corp. | 1 | $132,497 | 100% (paid) |
| Class 5 | Secured Non-Tax Claims – Mustang NH, LLC | 1 | $544,808 | 100% (cure over 10 years) |
| Class 6 | Priority Non-Tax Unsecured Claims of Employees (÷5) | 74 | $110,089 | 100% (paid) |
| Class 7 | Unsecured Deficiency Claims of Montgomery Capital Partners I, LP | 2 | $53,117 | 2%+ |
| Class 8 | General Unsecured Claims | 94 | $477,116 | 2%+ |
| Class 9 | Equity Interests | 2 | $0 | 0% |
| -- | Totals | 190 | $2,534,718 | |

| Class of Claims | Classification of Claims against Remarkable Healthcare of Dallas, LP | Est. No. of Claims | Estimated Allowed Amt. of Claims | Estimated Recovery of Classes |
|---|---|---|---|---|
| N/A | Administrative Claims (other than ordinary course) (÷5) | 8 | $239,650 | 95% (partially paid) |
| N/A | Priority Tax Claims | 2 | $0 | -- |
| Class 1 | Secured Non-Tax Claims – Comerica Bank (÷5) | 3 | $993,573 | 48% |
| Class 2 | Secured Non-Tax Claims – Montgomery Capital Partners I, LP (÷5) | 2 | $99,117 | 46% (over 5 years) |
| Class 3 | Secured Non-Tax Claims – GMP Dallas NH, Ltd. | 1 | $291,467 | 100% (cure over 10 years) |
| Class 4 | Secured Non-Tax Claims – PeopleFund | 1 | $40,008 | 50% |
| Class 5 | Priority Non-Tax Unsecured Claims of Employees (÷5) | 96 | $110,089 | 100% (paid) |
| Class 6 | Unsecured Deficiency Claims of Montgomery Capital Partners I, LP | 2 | $53,117 | 2%+ |
| Class 7 | General Unsecured Claims | 99 | $607,011 | 2%+ |

---

[4] On each table, the estimated aggregate Allowed Amount includes amounts that may have been previously paid by prior Court order, but does not reflect interest that will be paid on secured claims.

[5] On each table, assuming holders of Claims do not agree to receive alternative treatment.

| Class 8 | Equity Interests | 2 | $0 | 0% |
|---|---|---|---|---|
| -- | Totals | 216 | $2,318,102 | |

| Class of Claims | Classification of Claims against Remarkable Healthcare of Fort Worth, LP | Est. No. of Claims | Estimated Allowed Amt. of Claims | Estimated Recovery of Classes |
|---|---|---|---|---|
| N/A | Administrative Claims (other than ordinary course) (÷5) | 8 | $239,650 | 95% (partially paid) |
| N/A | Priority Tax Claims | 1 | $0 | -- |
| Class 1 | Secured Tax Claims of Tarrant County | 1 | $9,503 | 100% |
| Class 2 | Secured Non-Tax Claims – Comerica Bank (÷5) | 3 | $993,573 | 48% |
| Class 3 | Secured Non-Tax Claims – Montgomery Capital Partners I, LP (÷5) | 2 | $99,117 | 46% (over 5 years) |
| Class 4 | Secured Non-Tax Claims – WAG Development, Ltd. | 1 | $390,629 | 100% (cure over 10 years) |
| Class 5 | Secured Non-Tax Claims – PeopleFund | 1 | $0 | -- |
| Class 6 | Priority Non-Tax Unsecured Claims of Employees (÷5) | 139 | $110,089 | 100% (paid) |
| Class 7 | Unsecured Deficiency Claims of Montgomery Capital Partners I, LP | 2 | $53,117 | 2%+ |
| Class 8 | General Unsecured Claims | 118 | $643,161 | 2%+ |
| Class 9 | Equity Interests | 2 | $0 | 0% |
| -- | Totals | 278 | $2,422,909 | |

| Class of Claims | Classification of Claims against Remarkable Healthcare of Seguin, LP | Est. No. of Claims | Estimated Allowed Amt. of Claims | Estimated Recovery of Classes |
|---|---|---|---|---|
| N/A | Administrative Claims (other than ordinary course) (÷5) | 8 | $239,650 | 95% (partially paid) |
| N/A | Priority Tax Claims | 2 | $100 | 100% |
| Class 1 | Secured Non-Tax Claims – Comerica Bank (÷5) | 3 | $993,573 | 48% |
| Class 2 | Secured Non-Tax Claims – Montgomery Capital Partners 1, LP (÷5) | 2 | $99,117 | 46% (over 5 years) |
| Class 3 | Secured Non-Tax Claims – Guadalupe NH Development, Ltd. | 1 | $322,803 | 100% (cure over 10 years) |
| Class 4 | Secured Non-Tax Claims – PeopleFund | 1 | $0 | -- |
| Class 5 | Priority Non-Tax Unsecured Claims of Employees (÷5) | 112 | $110,089 | 100% (paid) |
| Class 6 | Unsecured Deficiency Claims of Montgomery Capital Partners I, LP | 2 | $53,117 | 2%+ |
| Class 7 | General Unsecured Claims | 131 | $673,916 | 2%+ |
| Class 8 | Equity Interests | 2 | $0 | 0% |
| -- | Totals | 264 | $2,376,435 | |

| Class of Claims | Classification of Claims against Remarkable Healthcare, LLC | Est. No. of Claims | Estimated Allowed Amt. of Claims | Estimated Recovery of Classes |
|---|---|---|---|---|
| N/A | Administrative Claims (other than ordinary course) (÷5) | 8 | $239,650 | 95% (partially paid) |

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                         **Page 14**

| N/A | Priority Tax Claims | 2 | $219 | 100% |
|---|---|---|---|---|
| Class 1 | Secured Non-Tax Claims – Comerica Bank (÷5) | 3 | $993,573 | 48% |
| Class 2 | Secured Non-Tax Claims – Montgomery Capital Partners I, LP (÷5) | 2 | $99,117 | 46% (over 5 years) |
| Class 3 | Secured Non-Tax Claims – Mustang NH, LLC | 1 | $0 | -- (cure under RH Carrollton) |
| Class 4 | Secured Non-Tax Claims – PeopleFund | 1 | $0 | -- |
| Class 5 | Priority Non-Tax Unsecured Claims of Employees (÷5) | 14 | $110,089 | 100% |
| Class 6 | Unsecured Deficiency Claims of Montgomery Capital Partners I, LP | 2 | $53,117 | 2%+ |
| Class 7 | General Unsecured Claims | 18 | $47,883 | 2%+ |
| Class 8 | Equity Interests | 1 | $0 | 0% |
| -- | Totals | 52 | $1,427,718 | |

D.  *Estimated Professional Fees and Reorganization Costs*

The Debtors estimate that aggregate requested post-petition professional fees and other reorganization costs asserted in the Bankruptcy Cases, excluding ordinary course professionals and/or liabilities, will be approximately as set forth below on the Effective Date, assuming an Effective Date in May 2019.  The estimated requested Administrative Expenses will be as follows:

| Administrative Claims (all subject to Court approval) (*incl. amts. previously paid*) | Amounts: |
|---|---|
| 28 USC § 1930, UST Quarterly Fees[6] | $300,000 |
| 11 USC § 503(b)(2), Curtis \| Castillo PC, Debtors' Bankruptcy Counsel[7] | $300,000 |
| 11 USC § 503(b)(2), Searcy & Searcy, Committee's Bankruptcy Counsel | $100,000 |
| 11 USC § 503(b)(2), Griffin Financial Group, Debtors' Financial Professional[8] | $290,000 |
| 11 USC § 503(b)(9), Medline Industries, Inc. | $26,750 |
| 11 USC § 503(b)(9), Green Mountain Energy | $13,264 |
| 11 USC § 503(b)(9), Pharmscript | $56,939 |
| 11 USC § 503(b)(9), US Foods | $50,760 |
| Totals: | $1,137,713 |

E.   *Estate Actions*

Pursuant to sections 547 and 550 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety (90) days immediately prior to the filing of its bankruptcy petition with respect to pre-existing debts, to the extent the transferee received more than it would have in respect of the pre-existing debt had the debtor been liquidated under Chapter 7 of the Bankruptcy Code. These causes of action are generally referred to as "preference actions". In the case of Insiders, the Bankruptcy Code provides for a one-year preference period. There are certain defenses to such recoveries. Transfers made in the ordinary course of the debtor's and the transferee's businesses, according to ordinary business terms, are not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the Bankruptcy Case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a transfer is recovered by a debtor, the transferee has a general unsecured claim against the debtor to the extent of the recovery. The Debtors reserve all rights to pursue, at their sole discretion, any Estate Actions not limited to, but including, any preference to the full extent allowed under the Bankruptcy Code and applicable state laws. The Debtors also may pursue other actions including but not limited to actions under Chapter 5 of the Bankruptcy Code. After confirmation of the Plan, the Reorganized Debtors shall be vested to bring such causes of action for the benefit of creditors of the estate, and the bringing of any such action shall be at the sole discretion of the Reorganized Debtors.

Notwithstanding the forgoing, at this time, the Debtors do not anticipate filing any preference actions against their creditors because Debtors do not believe they have viable preference claims. In preparing this Disclosure Statement, the Debtors' management has reviewed the preferences listed in Item #3 of each Debtor's Statement of Financial Affairs to determine whether claims should be brought against the creditors. If these preference claims were brought, the creditors would colorably defend by arguing the payments that generally were made in the ordinary course of business or for which the creditors provided contemporaneous or subsequent new value to the Debtors. These statements shall not be deemed admissions against the Debtors but rather merely an explanation that the creditors would have colorable affirmative defenses to the preference payments under section 547(c) of the Bankruptcy Code. Additionally, for business purposes, the Debtors do not see value in suing their regular vendors, but, rather, wish to foster good business relationships with their creditors. This is often referred to as the "business judgment" rule. As to payments to insiders, the Debtors already previously vetted those payments and resolved they were made in the ordinary course or resolved them through the Court's prior orders on use of cash collateral.

Also, under the Bankruptcy Code and various state laws, a debtor may recover certain transfers of property, including the grant of a security interest in property or the undertaking of an obligation, made while insolvent or which rendered it insolvent if, and to the extent, the debtor received less than fair value for such property. The Debtors and their legal and financial professionals reviewed any significant transfers made by the Debtors within the years

---

[6] For four quarters of 2018, Debtors paid $198,124.13

[7] To assist in confirmation of the Plan and viability of the Reorganized Debtors, the Debtors' legal professionals are willing to defer payment of a portion of professional fees of up to $50,000.

[8] To assist in confirmation of the Plan and viability of the Reorganized Debtors, the Debtors' financial professionals are willing to defer or possibly waive payment of a portion of professional fees of up to $50,000.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**

preceding the Petition Date for potential avoidance and recovery as fraudulent transfers under section 544, 548, and/or 550 of the Bankruptcy Code. The Debtors reserve all rights to pursue, in Debtors' sole discretion, any fraud or fraudulent transfer to the full extent allowed under the Bankruptcy Code and applicable state laws. After confirmation of the Plan, the Reorganized Debtors shall be vested to bring such causes of action for the benefit of creditors of the estate.

Debtors have listed claims and counterclaims against several parties within the Debtors' Schedules (A/B no. 74) and Statements of Financial Affairs (Part 3: 7), including against (a) Omnicare Pharmacy of Texas 1, LP d/b/a Omnicare of Ft. Worth, and Neighborcare Pharmacy Services, Inc. d/b/a Omnicare of San Antonio for claims including breach of contract and fraudulent inducement; as well as against (b) Medicine Chest Institutional Pharmacy Group, LLC, Medicine Chest Institutional Pharmacy, LLC, and Medicine Chest #120, LLC for claims including breach of contract and fraudulent inducement. Additionally, postpetition, the Debtors (with Comerica's consent) provided $70,000.00 to US Capital Global Partners, LLC to perform due diligence in connection with a potential loan to the Debtors. The Debtors subsequently learned US Capital was not prepared to provide the loan and the Debtors may have claims against US Capital for fraudulent inducement, fraudulent misrepresentation, fraud, fraud by omission, and/or breach of contract. The Debtors also may have postpetition claims related to negligence and gross negligence against their former insurance brokers, Pitts, Birdsong, Fennell, and Associates, for their failure to timely and properly market and obtain renewal of insurance for the Debtors, causing the Debtors to change brokers and incur higher costs due to the delays and improper claims reporting. The Debtors and Reorganized Debtors expressly preserve these Estate Actions to be pursued post-confirmation. Subject to confirmation, Alleon has requested that its liens attach to any causes of action of the Debtors.

In *Medicine Chest IP v. Remarkable Healthcare of Fort Worth LP*, Cause No. 153-282158-15, pending in the 153rd Judicial District of Tarrant County, Texas, Medicine Chest has asserted claims against Debtors for breach of contract and fraud arising out of a contract between the parties for pharmaceutical services. Debtors have requested damages of $1.2 million via counterclaims against Medicine Chest for breach of contract, fraudulent inducement, fraud, and negligent misrepresentation arising from Medicine Chest's failure to use an agreed-upon electronic medical records service which was a condition of the contract between Medicine Chest and Debtors. Additional information can be ascertained from the Tarrant County Clerk of the Court.

*In Omnicare Pharmacy of Texas 1, et al v. Remarkable Healthcare, et al*, Cause No: N17C-09-106 (MMJ) pending before the Superior Court of the State of Delaware, Omnicare is asserting claims against Debtors for breach of contract, unjust enrichment, goods sold, delivered and accepted, and open account. Debtors have requested damages of over $500,000 via counterclaims against Omnicare for fraudulent inducement, fraudulent misrepresentation, and breach of contract arising from Omnicare's failure to deliver medicine timely, charging for goods not ordered, failing to follow agreed clinical edits, and formulary and generally failing to perform as to the terms of the agreements at issue. Additional information can be ascertained from the Clerk of the Court of the Superior Court of the State of Delaware.

Due to the costs of the prepetition litigation (approximately $250,000 for Debtors' two cases) and the risks associated with litigation generally, the Debtors currently are unable to predict the outcome of these lawsuits and the amount of the damages that may be awarded Debtors. The Debtors, however, are willing to share the net proceeds of any litigation recoveries with their creditors in the Plan. The Debtors' investigation into these claims began prepetition, and the Debtors worked with their prepetition litigation counsel to pursue the claims and file the pleadings on record in those cases. The Debtors have not pushed forward to continue such litigation on a postpetition basis due to the automatic stay. The Debtors believe they are best suited to continue pursuit of the forgoing claims postconfirmation due to the Debtors' prepetition litigation and work with prepetition litigation counsel and institutional knowledge of the representations and transactions.

Notwithstanding the foregoing reservations and other than described above, the Debtors do not believe they have any other viable claims for material recoveries that would benefit the estates through litigation. Accordingly, the projected Plan payments are premised upon new-lender funding rather than potential litigation recoveries.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                         **Page 17**

## VII.  <u>OVERVIEW OF THE PLAN</u>

THE PLAN ANNEXED HERETO AS <u>EXHIBIT A</u> IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT.  THE OVERVIEW OF THE PLAN SET FORTH HEREIN IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN.  IN THE EVENT OF AN INCONSISTENCY BETWEEN THE PROVISIONS OF THE PLAN AND THE OVERVIEW CONTAINED HEREIN, THE TERMS OF THE PLAN SHALL GOVERN.

Generally, the Plan is a Chapter 11 plan that obtains new financing to pay off existing secured lenders and vests the assets of the Debtors' estates in the Reorganized Debtors to be administered by the Reorganized Debtors. The Debtors retained Griffin Financial Group, LLC to seek interest in new financing for the Debtors. The Debtors have recently executed a term sheet with a new lender named, Alleon.  Alleon has expressed interest in providing new funding to the Debtors, subject to its own due diligence and other considerations. The Debtors believe that, after the due diligence period[9], Alleon will offer the Debtors new funding that will allow the Debtors to partially pay off existing secured lenders, fund certain of the Debtors' obligations under the Plan, and allow the Debtors to exit bankruptcy. Alleon's loans will be secured with first-priority liens on substantially all of the Debtors' assets postconfirmation. Through existing postpetition management, as disclosed in Section IV of the Disclosure Statement, the Reorganized Debtors then will begin to make distributions and payments required by the Plan, object to Claims against the Debtors' estates, and prosecute claims and Estate Actions against third parties as appropriate to obtain assets for purposes of the Plan distributions to creditors.

On the Effective Date, all remaining real and personal property of the Debtors' estates, including but not limited to all Estate Actions, shall vest in the Reorganized Debtors.  From and after the Effective Date, the Reorganized Debtors shall be authorized to operate in the ordinary course of business, but liquidate causes of action and other assets as reasonable and/or necessary, and shall be authorized to make the distributions required under, and implement the provisions of, the Plan.

The classes of Claims against and the Interests in the Debtors shall be treated as set forth in Article IV of the Plan attached hereto. **Payment details are set forth within the Plan attached hereto as Exhibit A and should be read closely.**

## VIII.  <u>MEANS FOR EXECUTION OF THE PLAN</u>

A.  *Powers and Duties of the Reorganized Debtors with Respect to Consummation of the Plan*

Under the Plan, the Reorganized Debtors are empowered to: (a) take all steps and execute all instruments and documents necessary to effectuate the Plan; (b) make distributions and payments contemplated by the Plan; (c) comply with the Plan and the obligations thereunder; (d) employ, retain, or replace Professional Persons to represent it with respect to its responsibilities; (e) object to Claims; (f) prosecute the Estate Actions; and (g) exercise such other powers as may be vested in the Reorganized Debtors pursuant to order of the Court or pursuant to the Plan or as the Reorganized Debtors deem to be necessary and proper to carry out the provisions of the Plan. The Reorganized Debtors shall have the duties of carrying out the provisions of the Plan, which shall include taking or not taking any action that the Reorganized Debtors deem to be in furtherance of the Plan.

B.  *Vesting of Assets*

On the Effective Date, all real and personal property of the estates of the Debtors, including but not limited to all Estate Actions, shall vest in the Reorganized Debtors.  Except as expressly provided in the Plan, all assets of the Debtors shall vest free and clear of all Claims, Interests, and Liens or successor liability claims in the Reorganized Debtors, which shall be owned and controlled as set out in the Plan.

---

[9] The Debtors estimate the due diligence period will conclude by Mid-April 2019.

C.  *Corporate Purpose of the Reorganized Debtors*

From and after the Effective Date, the Reorganized Debtors shall be duty bound to promptly and efficiently administer estate assets and shall be authorized to operate in the ordinary course of business and shall be authorized to make the distributions required under, and implement the provisions of, the Plan.

D.  *Assumption of Liabilities*

The liability for and obligations under the Plan shall be assumed by and become obligations of the Reorganized Debtors.

E.  *Contested Claims*

On and after the Effective Date, the filing, litigation, settlement, or withdrawal of any and all objections to Claims or Estate Actions may be made by the Reorganized Debtors as soon as practicable.

F.  *Estimated Claims*

Except as otherwise provided herein, the Court may estimate for purposes of allowance pursuant to section 502(c) of the Bankruptcy Code, (i) any Contested Claim or unliquidated Claim, or (ii) any portion or part of a Claim that is, itself, unliquidated. Any Estimation Order, to the extent it becomes a Final Order, shall determine the amount of the Allowed Claim so estimated.

G.  *Deficiency Claims*

Except as otherwise provided in the Plan or in any other Final Order of the Court, in the event of (i) Debtors' return of collateral or (ii) the valuation of such collateral under 11 U.S.C. § 506 or other applicable bankruptcy or non-bankruptcy law, the holder of Secured Non-Tax Claims shall have thirty (30) days from the earlier of (a) the date that Debtors return to such holder the Collateral securing such holder's claim, if applicable, (b) the date of entry of a Final Order of the Court lifting the automatic stay and authorizing Debtors to return to such holder the Collateral securing such holder's claim, or (c) the determination by the Bankruptcy Court the value of such Collateral pursuant to 11 U.S.C. § 506, to file a proof of claim for any resulting unsecured Deficiency Amount Claim (including for all fees and costs associated with any liquidation of the Collateral under applicable law), against the estate resulting from the liquidation of the Collateral or the valuation of the Collateral, as the case may be.  A deficiency proof of claim filed as described herein for any Deficiency Amount shall receive the treatment as described in Article IV of the Plan.

H.  *Conditions Precedent to Effective Date*

The occurrence of the Effective Date of the Plan is subject to the occurrence of the following conditions precedent:

(a)  All documents effectuating the Plan shall have been executed and delivered by the parties thereto, and all conditions to the effectiveness of such documents shall have been satisfied or waived as provided therein; and

(b)  The Confirmation Order shall have become a Final Order or shall not be stayed by a court of competent jurisdiction.

I.  *Waiver of Conditions*

The conditions to the Effective Date may be waived, in whole or in part by the Debtors, upon written approval of Debtors' counsel, at any time, without notice.  The failure to satisfy or waive any condition may be asserted by the Debtors regardless of the circumstances giving rise to the failure (including any actions or inaction by the Debtor). The failure of the Debtors to exercise any of the foregoing rights shall not be deemed a waiver of

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                              **Page 19**

any other rights and each right shall be deemed an ongoing right that may be asserted at any time.

J. *Retention of Bankruptcy Court Jurisdiction*

The Bankruptcy Court shall retain jurisdiction as set forth in the Plan.

K. *Miscellaneous Provisions of the Plan*

1. Setoff and Other Rights.

In the event that the Debtors have claims of any nature whatsoever against the holder of a Claim, the Debtors may, but are not required to, setoff against the Claim (and any payments or other distributions to be made in respect of such Claim hereunder), subject to the provisions of section 553 of the Bankruptcy Code. Neither the failure to setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors of any claim that the Debtors have against the holder of a Claim.

2. Discharge.

Except as otherwise expressly provided in the Plan, the rights and treatment afforded in the Plan shall discharge all existing security interests, liens, debts and Claims of any kind, nature, or description whatsoever against the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code; upon the Effective Date, all existing Claims against the Debtors shall be, and shall be deemed to be, discharged, and all holders of Claims shall be precluded from asserting against the Debtors, or any of their assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder filed a proof of Claim. Confirmation of the Plan and the obligations imposed on the Debtors and/or the Reorganized Debtors herein shall be in complete satisfaction, discharge and release of all Claims of any nature whatsoever against the Debtors and/or the Reorganized Debtors or any of their assets or properties; and, upon the Effective Date, the Debtors shall be deemed discharged, and released from any and all Claims, including but not limited to demands and liabilities that arose before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code that arose before the Effective Date, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of a Claim based upon such debt has accepted the Plan. Except as provided herein, the Confirmation Order shall be a judicial determination of discharge of all liabilities of the Debtors. As provided in section 524 of the Bankruptcy Code, such discharge shall void any judgment against the Debtors at any time obtained, to the extent it relates to a Claim discharged and operates as an injunction against the prosecution of any action against the Debtors, or their property, to the extent it relates to a Claim discharged. The discharge granted herein shall not discharge the Reorganized Debtors from the obligations in the Plan.

3. **Injunctions**

*The Confirmation Order shall contain such injunctions as may be necessary or helpful to effectuate the effectiveness of the Debtors' Plan provided herein. Without limiting the generality of the foregoing, such injunctions shall include an absolute prohibition from pursuing or collecting Claims against the Debtors in any manner other than as provided for in the Plan, including any trust fund liabilities, constructive trusts, statutory trusts, or liabilities arising from contribution, subrogation, warranty, indemnification or guarantee agreements of the Debtors, or any foreclosure action by any Lien creditors. This injunction shall not prevent creditors from enforcing their rights under the Plan, and may be lifted by the Court upon motion filed after notice and a hearing given in the event of an uncured Debtor default as set forth in the Plan.*

4. **Injunction Regarding Claims Against the Debtors**

*From and after the Confirmation Date, all persons or entities that hold, have held, or may hold Claims*

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 20**

*against or Interests in the Debtors are permanently restrained and enjoined from, directly or indirectly:*

        *(a)      Commencing or continuing in any manner any action or other proceeding of any kind against the Debtors or the Reorganized Debtors, or Assets of the Debtors to collect or recover any property on account of any such Claim or Interest;*

        *(b)      Enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order to collect or recover any property on account of any such Claim or Interest against the Debtors or the Reorganized Debtors, or Assets of the Debtors;*

        *(c)      Creating, perfecting, or enforcing any Lien or encumbrance of any kind against the Debtors or the Reorganized Debtors, or the Assets of the Debtors;*

        *(d)      Asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due the Debtors or the Reorganized Debtors, or the Assets of the Debtors, except as otherwise allowed by the Bankruptcy Court or Bankruptcy Code;*

        *(e)      Commencing or continuing any action against the Debtors or the Reorganized Debtors, or the Assets of the Debtors in any manner or forum in respect of such Claim or Interest that does not conform to or comply with or that is inconsistent with the Plan; and*

        *(f)      Taking any action to interfere with the implementation or consummation of the Plan.*

Notwithstanding the foregoing, however, nothing herein shall prohibit any holder of a Claim or Interest from prosecuting a proof of Claim or Interest in the Bankruptcy Case or from enforcing such holder's rights under the Plan.

    5.    Lawsuits

Upon entry of the Confirmation Order, all lawsuits, litigation, administrative, or other proceedings, judicial or administrative, in connection with the assertion of a Claim or Lien against the Debtors or property of the Debtors' estates, shall be subject to the injunctions set forth in the Bankruptcy Code and the Court's Confirmation Order. Such injunctions shall be with prejudice to the assertion of such Claim or Lien in any manner other than as prescribed by the Plan. All parties to any such action shall be enjoined by the Bankruptcy Court in the Confirmation Order from taking any action in violation of the Bankruptcy Code or the Confirmation Order. All lawsuits, litigation, administrative, or any other proceedings, judicial or administrative, in connection with the assertion of any Claims by the Debtors shall become property of the Reorganized Debtors to prosecute, settle, or dismiss as the Reorganized Debtors see fit. Nothing in this paragraph shall create or be deemed to create any additional discharges not provided in the Bankruptcy Code, the Plan, or Confirmation Order.

    6.    Binding Effect

Upon the occurrence of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims, and all of his respective successors and assigns; provided, however, that if the Plan is not confirmed and made effective by the Debtors, the Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtors or any other person, (b) to prejudice in any manner the rights of the Debtors or any other person or holders if any Claim or (c) to constitute any admission by the Debtors or any other person.

    7.    Modification or Revocation of Plan

Modifications of the Plan may be proposed in writing by the Debtors at any time before the Confirmation Date, provided that (a) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code; (b) the Debtors shall have complied with section 1125 of the Bankruptcy Code; and (c) such modification otherwise complies with the Bankruptcy Code. The Plan may be modified at any time after the Confirmation Date and

before substantial consummation by the Debtor, provided that (i) the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, (ii) the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified under section 1129 of the Bankruptcy Code, and (iii) the Debtors serve creditors with any proposed modification and notice of hearing for same, and (iv) the circumstances warrant such modifications. A holder of a Claim that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

The Debtors reserve the right to revoke and/or withdraw the Plan prior to entry of the Confirmation Order. If the Debtors revoke and/or withdraw the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained herein shall be deemed (a) to constitute a waiver or release of any Claims by the Debtors or any other person, (b) to prejudice in any manner the rights of the Debtors or any other person, or (c) to constitute an admission by the Debtors or any other person.

8.    Creditor Defaults

Any act or omission by a creditor in contravention of a provision within the Plan shall be deemed an event of default under the Plan. Upon an event of default that remains uncured after notice and opportunity to cure, sufficient under the circumstances, the Reorganized Debtors may seek to hold the defaulting party in contempt of the Confirmation Order. If such creditor is found to be in default under the Plan, such party may be required to pay the reasonable attorneys' fees and costs of the Reorganized Debtors in pursuing such matter. Furthermore, upon the finding of such a default by a creditor, the Bankruptcy Court may (a) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Rule 70 of the Federal Rules of Civil Procedure, or (b) issue and enter such other order as may be equitable which does not materially alter the terms of the Plan as confirmed.

9.    Retention of Causes of Action

The Reorganized Debtors shall retain, all rights, claims, defenses, and causes of action including, but not limited to, the Estate Actions, and shall have sole authority to prosecute and/or settle such actions without approval of the Bankruptcy Court under Bankruptcy Rule 9019 or otherwise.

## IX.  FEASIBILITY AND RISKS

Section 1129(a)(11) of the Bankruptcy Code requires a finding that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor in interest, unless liquidation is expressly contemplated by the Plan.  The Debtors' Plan underlies the projections set forth herein.

THE PROJECTED FINANCIAL INFORMATION AND OTHER FORWARD-LOOKING STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE BASED ON VARIOUS ASSUMPTIONS AND ESTIMATES AND WILL NOT BE UPDATED TO REFLECT EVENTS OCCURRING AFTER THE DATE HEREOF.  SUCH INFORMATION AND STATEMENTS ARE SUBJECT TO INHERENT UNCERTAINTIES AND TO A WIDE VARIETY OF SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE RISKS, INCLUDING, AMONG OTHERS, THOSE RISKS DESCRIBED HEREIN.  CONSEQUENTLY, ACTUAL EVENTS, CIRCUMSTANCES, EFFECTS AND RESULTS MAY VARY SIGNIFICANTLY FROM THOSE INCLUDED IN OR CONTEMPLATED BY SUCH PROJECTED FINANCIAL INFORMATION AND SUCH OTHER FORWARD-LOOKING STATEMENTS.

A.  *Management's Discussion of Financial Projections*

The Debtors believe that, based upon the value of their assets and liabilities, as well as the fact that the Plan's effectiveness is logistically simple, the Plan is feasible and the Reorganized Debtors will be able to make the distributions contemplated by the Plan and will be financially secure and not need to seek further reorganization after

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 22**

confirmation.  The Debtors' management is ready, willing, and able to perform those tasks described in the Disclosure Statement to ensure the Plan's success.

B.  *Risks*

The Plan is subject to a number of material risks, including those enumerated below.  Prior to deciding how to vote on the Plan, each holder of an impaired Claim and holder of an Interest should carefully consider all of the information contained in this Disclosure Statement, especially the factors mentioned in the following paragraphs.

1.  Certain Risks of Non-Confirmation

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Court that the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization and that the value of the distributions to non-accepting holders of Claims and Interests will be not less than the value of the distributions that such holders would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code.  Although the Debtors believe that these requirements will be satisfied, there can be no assurance that the Court will concur.  The confirmation and consummation of the Plan also are subject to certain conditions, which are described in Articles III and VIII of this Disclosure Statement.

If the Plan were not to be confirmed and consummated, it is unclear whether a reorganization comparable to the reorganization contemplated hereby could be implemented in a timely manner and, if so, what distributions holders of Claims and Interests ultimately would receive with respect to their Claims and Interests.  Moreover, if an alternative reorganization could not be implemented in a timely manner, it is possible that the Debtors would have to liquidate their assets, in which case it is possible the holders of Claims and Interests would receive substantially less than they would received pursuant to the Plan.  *See* Article X of this Disclosure Statement.

2.  Potential Effects of a Prolonged Chapter 11 Proceeding

Prolonged Chapter 11 proceedings could have adverse effects on the Debtors, including the accrual of carrying costs on assets, and the continuing accrual of Administrative Expenses relating to the continuation of bankruptcy proceedings.

3.  Risks Relating to the Projections and Liquidation Analysis

The management of the Debtors has prepared the projected financial information in connection with the development of the Plan to present the projected effects of the Plan and the transactions contemplated hereby.  The projections assume that the Plan and the transactions contemplated hereby will be implemented in accordance with its terms and are based upon numerous other assumptions and estimates.  The assumptions and estimates underlying the projections are inherently uncertain and are subject to significant business, economic, legal, and competitive risks and uncertainties that could cause actual results to differ materially from those projected.  Accordingly, the projections are not necessarily indicative of the future financial condition or results of operations of the Reorganized Debtors, which may vary significantly from those set forth in the projections.  Consequently, the projected financial information contained in this Disclosure Statement should not be regarded as a representation by the Debtors, the Debtors' advisors, or any other person that the projections can or will be achieved. The projections are attached hereto as "**Exhibit C**."

4.  Capital Requirements

The Debtors believe that the Cash generated from operations during the Bankruptcy Cases and Plan process, as well as the additional funding expected to be provided by the new lender, will be adequate to support payment on the Reorganized Debtors' Administrative Expense Claims and Priority Tax Claims; however, there can be no assurance that one or more unexpected necessary capital expenditures will not impact the Reorganized Debtors

materially and adversely, and no assurance can be given that emergency financing will be available when needed and on reasonable terms. To mitigate against such losses, the Debtors and the Reorganized Debtors shall continue to maintain and carry, appropriate insurance, cash accounts at FDIC insured depository institutions, and procedures to protect the estate's assets.

5.   Forward-Looking Information May Prove Inaccurate

This Disclosure Statement contains various forward-looking statements and information that are based on management's beliefs as well as assumptions made by and information currently available to management. When used in this document, the words "believe," "expect," "anticipate," and similar expressions are intended to identify forward-looking statements. Such statements are subject to certain risks, uncertainties, and assumptions including those identified above. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, actual results may vary materially from those anticipated, estimated, or projected.

6.   Market and Economic Factors

This Disclosure Statement assumes that the market and current economic conditions remain relatively unchanged or moderately and gradually improved. Any significant decrease in patients or increases in expenses could have a negative effect on the Debtors and Debtors' current and future operations and collections, and could affect the figures and projections presented in this Disclosure Statement.

7.   Administrative, Reimbursement, and Regulatory Factors

This Disclosure Statement assumes that the current administrative, reimbursement, and regulatory conditions in the Debtors' Skilled Nursing Facilities industry remain relatively unchanged. Any significant increase in administrative costs or reimbursement delays could have a negative effect on the Debtors and their current and future operations and collections, and could affect the figures and projections presented in this Disclosure Statement.

## X.  ALTERNATIVES TO PLAN

A.   *Liquidation Analysis*

Section 1129 of the Bankruptcy Code provides that the Court may confirm a plan of reorganization only if certain requirements are met. One of these requirements is that each non-accepting holder of an Allowed Claim or Interest must receive or retain under the Plan, on account of such Claim or Interest, property as of the Effective Date of the Plan at least equal to the value such holder would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.

For purposes of the following discussion, it is assumed that a Chapter 7 trustee would seek to maximize the value of the estate by attempting to sell the assets of the Debtors or pursue any claims against third parties. However, the Debtors believe that the circumstances surrounding a liquidation under Chapter 7 would inevitably lead to conditions that would substantially detract from the total value returned to the estate. Further, there is no assurance that a Chapter 7 trustee will promptly sell the assets or aggressively and appropriately pursue the estate's claims, particularly as several Chapter 7 panel trustees move less swiftly that others and there is no guarantee as to which trustee is randomly selected in a converted case.

The Chapter 7 test first requires an analysis of what assets would be available to distribute to creditors following the liquidation of the Debtors' assets in the context of a Chapter 7 case. Conversion to Chapter 7 is likely to result in delays, the cessation of the Debtors' operations, increased costs, and difficulties and delays in the collection of the receivables and an attendant reduction in the value of such receivables. The Debtors' only significant assets are cash and accounts receivable—both of which have been granted as security in their entirety to the secured creditors, Comerica Bank, PeopleFund, and Montgomery Capital Partners I, LP. The secured claim of Comerica Bank is approximately $4,967,862.48, the subordinated secured claim of Montgomery Capital Partners I, LP is nearly $500,000, and the secured claim of PeopleFund is approximately $40,000.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 24**

Next, the Chapter 7 test requires an examination of what claims would be asserted, and in what fashion, should the Debtors' cases convert to Chapter 7. The ramifications on Claim classification and treatment are also detailed in elsewhere in the Disclosure Statement.  Among other things, the Debtors secured creditors would move to collect on their collateral, resulting in additional delays and difficulties in collection and possible disputes between each other and the Chapter 7 estate.  The Debtors' leases would be rejected in Chapter 7, giving rise to substantial unsecured lease rejection damages claims by the landlords, in addition to the landlords' prepetition claim on the leases of $1,500,000.  As assets decline on account of the conversion to Chapter 7, classes of Claims will likely increase, which will further reduce overall recovery of classes.

Accordingly, the Debtors believe that a liquidation of the Debtors would result in a much lower recovery for all creditor classes.  At present, the Debtors' accounts receivable total approximately $10,000,000.  While a significant portion of the accounts receivable are relatively current, a substantial portion of the receivables are nevertheless older and likely more difficult to collect—particularly under a liquidation.  For these reasons, the Debtors believe that, in a liquidation scenario, no creditors subordinate to the secured creditors are likely to receive a distribution.  The significant administrative costs associated with a Chapter 7 liquidation, as well as the significant administrative expenses already incurred in this case, will further detract from any potential recovery for junior creditor classes.

Because the Debtors have sought funding from over 100 banks and lending institutions, they believe they have thoroughly tested the market for the value of the Debtors' assets.  Under the Plan, the proposed funds to be advanced are approximately $3.5 million.  Debtors' principal secured lender, Comerica, has liens on substantially all of the Debtors' assets and is owed nearly $5 million.  Other than cash and accounts receivable, the Debtors do not have other assets of material value that could pay creditors. Accordingly, unsecured creditors would receive no payments whatsoever in a Chapter 7 liquidation.  Further, the Debtors' landlords would not be cured and would incur substantial rejection damages claims, the Debtors' vendors would not be cured and would incur similar rejection damages claims, and the Debtors' principal lender would receive less than the amount proposed under the Plan. Further, in a Chapter 7 liquidation, the estates would bear the substantial costs of patient relocation and 60-day notices required by federal and state laws for closure of the facilities, which costs would substantially erode recovery for Debtors' principal lender.

The following are some, but not all, of the additional deleterious consequences that the Debtors believe would result from Chapter 7 liquidation:

- Substantial additional Chapter 7 administrative costs relating to Chapter 7 attorneys' fees, Chapter 7 financial-consultant fees, Chapter 7 trustee statutory payments, and other associated expenses would necessarily be incurred.

- A Chapter 7 trustee and new professionals likely will be unfamiliar with the Debtors' business and assets at the time of his/her appointment and are not likely to be in a position to fully pursue the Debtors' asset equity during the liquidation period as effectively as current management and professionals.

- The Chapter 7 Trustee's process of winding-down the Debtors' affairs, working with the state of Texas to resume patient care during their relocation, objecting to Claims, and making dividends could take much longer than contemplated under the Plan, particularly as there are numerous Chapter 7 cases that have been pending for several years without any distribution to Creditors despite funds in the estates' coffers.

Conversely, under the Plan, the Debtors propose to pay Comerica Bank a high percentage of its claim on the Effective Date, pay PeopleFund in part, pay administrative claims in full (unless otherwise agreed), pay their landlord in full over time, and pay a distribution to unsecured creditors.  The preservation of the Debtors' business and its going concern value provides the best opportunity for the vast majority of creditors to receive a recovery in these cases. Thus, although not all creditors are being paid in full under the Plan, they are receiving more than they would under a Chapter 7 case. In numeric terms, the forgoing liquidation analysis is further described in the chart attached to the Disclosure Statement as Exhibit E.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**                                    **Page 25**

B.  *Other Alternative Plans*

The Debtors believe that to maximize the value of the Debtors' assets and the return to creditors, the current Plan is the most desirable and beneficial plan to pursue.  Notwithstanding the foregoing, the Debtors will continue to consider all viable options.

## XI.  CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtors, and to holders of Claims and Interests.  This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations thereunder, judicial decisions, and published rulings and pronouncements of the IRS in effect on the date of this Disclosure Statement.  Changes in these rules, or new interpretations of these rules, may have retroactive effect and could significantly affect the federal income tax consequences described below.

The material U.S. federal income tax consequences of the Plan and the formation and operation of the Reorganized Debtors is complex and subject to uncertainties.  Except as may be provided herein, the Debtors have not requested a ruling from the IRS or an opinion with respect to any of the tax aspects of the Plan.  There can be no assurance that the IRS will agree with this discussion of material federal income tax consequences.  In addition, this summary does not address state, local, or foreign tax consequences of the Plan, and it does not purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign taxpayers, broker-dealers, banks, insurance companies, financial institutions, small business investment corporations, regulated investment companies, tax-exempt organizations, or investors in pass-through entities).

THE FOLLOWING SUMMARY OF CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED ON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A PARTICULAR CREDITOR.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS IN DETERMINING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES TO THEM IN CONNECTION WITH THE PLAN.

A.  *Federal Income Tax Consequences to the Debtors*

1.  In General

Pursuant to the Plan, a portion of the outstanding indebtedness of the Debtors is being satisfied at a discount.  The debt forgiveness income resulting from the satisfaction of Claims at a discount should not constitute taxable income, although it will reduce tax attributes, such as net operating loss ("NOL") carryovers.  The utilization of any NOL's remaining after application of the attribute reduction rules may be subject to limitations imposed by section 382 of the Tax Code.

2.  Treatment of Debt Discharge Income Under the Plan

Pursuant to the Plan, the aggregate outstanding indebtedness of the Debtors will be reduced.  In general, section 61(a)(12) of the Tax Code provides that a taxpayer who realizes discharge of indebtedness income must include such income ("Debt Discharge Income") in taxable gross income.  As a result of the Plan, the Debtors will realize a Debt Discharge if the fair market value of the property transferred by the Debtors to the Creditors for the benefit of Creditors is less than the amount of Claims that such Creditors have against the Debtors.  The Tax Code further provides in section 108(a)(1), however, that if a taxpayer is in a Title 11 case and the discharge of indebtedness is pursuant to a plan approved by a bankruptcy court, such Debt Discharge Income is not required to be included in gross income.  However, section 108(b) of the Tax Code further provides that amounts so excluded from gross income will reduce certain tax attributes of the taxpayer, including NOL carryovers and the adjusted tax bases of assets.

Debt Discharge Income will arise with respect to those Claim holders whose Claims are discharged by a

payment of Cash or distributions of property, with a value less than the face amount of the Allowed Claims. The Debt Discharge Income would equal the excess of the debt canceled over the Cash and fair market value of property received in exchange therefore. Regardless of the amount of Debt Discharge Income, there will be no taxable income recognized by the Debtors.

    B. *Federal Income Tax Consequences to Creditors*

       1. In General

    The tax consequences of the implementation of the Plan to a Claim holder will depend in part on (i) whether the Claim holder's Claim constitutes a security for federal income tax purposes, (ii) whether the Claim holder reports income on the accrual basis, (iii) whether the Claim holder receives consideration in more than one tax year of the Claim holder, (iv) whether the Claim holder is a resident of the United States, and (v) whether all the consideration received by the Claim holder is deemed to be received by that Claim holder as part of an integrated transaction.

    A Claim holder will recognize gain or loss on the exchange of his or her existing Claim (other than a Claim for accrued interest) for any consideration. The amount of such gain or loss will equal the difference between (i) the "amount realized" in respect of such Claim and (ii) the adjusted tax basis of the Claim holder in such Claim. Pursuant to section 1001 of the Tax Code, the "amount realized" will be equal to the sum of the Cash plus the fair market value of any other property received in such exchange.

    A Claim holder who receives Cash in full satisfaction of his or her Claim will be required to recognize gain or loss on the exchange. The Claim holder will recognize gain or loss equal to the difference between the "amount realized" in respect of such Claim and the adjusted tax basis of the Claim holder in the Claim, and the tax treatment of the exchange will parallel the tax treatment set forth above.

    In the case of a Claim holder whose existing Claim does not constitute a capital asset, the gain or loss realized on the exchange will give rise to ordinary income or loss. In the case of a Claim holder whose existing Claim constitutes a capital asset in his hands, the gain or loss required to be recognized will generally be classified as a capital gain or loss, except to the extent of interest. Any capital gain or loss recognized by a Claim holder will be long-term capital gain or loss with respect to those Claims for which the holding period of the Claim holder is more than twelve (12) months, and short-term capital gain or loss with respect to such Claims for which the holding period of the Claim holder is twelve (12) months or less.

       2. Payments Attributable to Interest

    Consideration attributable to accrued but unpaid interest will be treated as ordinary income, regardless of whether the Claim holder's existing Claims are capital assets in his hands and the exchange is pursuant to a tax reorganization. A Claim holder who, under his or her accounting method, was not previously required to include in income accrued but unpaid interest attributable to his existing Claims, and who exchanges his interest Claim for Cash, other property or stock, or a combination thereof, pursuant to the Plan will be treated as receiving ordinary interest income to the extent of any consideration so received allocable to such interest, regardless of whether that Claim holder realizes an overall gain or loss as a result of the exchange of his existing Claims. A Claim holder who previously was required to include in his or her taxable income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss, to the extent the amount of interest actually received by the Claim holder is less than the amount of interest taken into income by the Claim holder.

       3. Backup Withholding and Information Reporting

    Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding." Withholding generally applies if the holder: (i) fails to furnish his social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is his correct number and that he is not subject to backup withholding.

**DEBTORS' SECOND AMENDED DISCLOSURE STATEMENT**              **Page 27**

C.   *Federal Income Tax Consequences to Interest Holders*

Pursuant to the Plan, all interests in the Debtors are retained subject to the conditions of the Plan; however, no cash is to be distributed to interest holders from the Plan.

BECAUSE THE FINAL OUTCOME DEPENDS SO MUCH ON EACH INDIVIDUAL CLAIM HOLDER'S AND INTEREST HOLDER'S SITUATION, IT IS IMPERATIVE THAT EACH CLAIM AND INTEREST HOLDER SEEK INDIVIDUAL TAX COUNSEL FOR ADVICE ON HIS OR HER PARTICULAR SITUATION.

## XII.  CONCLUSION

This Disclosure Statement has attempted to provide information regarding the Debtors' estates and the potential benefits that will accrue to holders of Claims against and Interests in the Debtors under the Plan as proposed. The Plan is the result of extensive efforts by the Debtors and Debtors' advisors to provide creditors with a meaningful dividend.  The Debtors believe the Plan is feasible and will provide each holder of a Claim against the Debtors with an opportunity to receive greater benefits than those that would be received by any other alternative available to the Debtors.  Therefore, the Debtors urge you to vote in favor of the Plan.

Through confirmation of the Plan, the Debtors believe that the Reorganized Debtors can resolve all Claims that have been, or could be, asserted against the estates in a timely and cost-effective manner.  The Debtors believe that the Plan provides a mechanism to resolve and provide just compensation to all Claim holders.  The Debtors believe that the Plan is fair to all parties-in-interest and should be approved by all persons entitled to vote.

Whether or not you expect to attend the Confirmation Hearing, you must sign, date, and mail, hand deliver, or fax your Ballot as soon as possible for the purpose of having your vote count at such hearing.  All votes must be received by the Debtors' counsel, as indicated on the Ballot.  Any Ballot that is unsigned, illegible, or that fails to properly designate an acceptance or rejection of the Plan with an appropriate Claim amount may not be counted as a vote in favor of the Plan.

**DATED: April 9, 2019**

**Remarkable Healthcare of Carrollton, LP**                    **Remarkable Healthcare of Fort Worth, LP**

By: _____                                    By: _____
        Laurie Beth McPike                                             Laurie Beth McPike
        President/CEO                                                  President/CEO

**Remarkable Healthcare of Dallas, LP**                        **Remarkable Healthcare of Seguin, LP**

By: _____                                    By: _____
        Laurie Beth McPike                                             Laurie Beth McPike
        President/CEO                                                  President/CEO

                                                       **Remarkable Healthcare, LLC**

                                                     By: _____
                                                              Laurie Beth McPike
                                                              Managing Member

### EXHIBITS TO DISCLOSURE STATEMENT

EXHIBIT "A"    Plan of Reorganization

EXHIBIT "B"    Plan Waterfall Chart

EXHIBIT "C"    Ch. 11 Plan Projections

EXHIBIT "D"    Alleon Term Sheet

EXHIBIT "E"    Ch. 11 v. Ch. 7 Liquidation Comparison Chart